**IMPERIAL COMMODITIES CORPORATION, Plaintiff,**

v.

**S.S. MARIA AUXILIADORA, her engines, boilers, etc., Companhia De Navegacao Maritima Netumar, Affiliated FM Insurance Company, Defendants.**

**No. 85 CIV 5290 (LBS).**

United States District Court, S.D. New York.

Nov. 14, 1986.

Bernstein, Weiss, Coplan, Weinstein & Lake, New York City, for plaintiff; Philip Weinstein, of counsel.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for Companhia de Navegacao Maritima Netumar; Renato C. Giallorenzi, of counsel.

Vincent, Berg & Russo, New York City, for Affiliated FM Ins. Co., Richard E. Juzumas; of counsel.

## OPINION

SAND, District Judge.

This is an action in admiralty brought by Imperial Commodities Corporation, a New York corporation which is an importer and distributor of coffee, against Affiliated FM Insurance Company ("FM"), a Rhode Island corporation which issued an all-risk warehouse-to-warehouse policy insuring plaintiff's cargo. Also named as a defendant Companhia De Navegacao Maritima Netumar ("Netumar"), the carrier of the cargo of coffee here at issue, and FM has cross-claimed against Netumar. The following constitutes our findings of fact and conclusions of law.

Plaintiff shipped aboard the S.S. Maria Auxiliadora, a vessel owned by Netumar, 3,000 bags of coffee, 132 pounds net, which it had contracted to sell to Barzula, a roaster in Toronto, at $1.54 per pound. Plaintiff noticed this shipment to FM at a stated insured value of $673,200 (plaintiff's Exh. X). The coffee was loaded in Brazil in eight containers, the perimeters of which were lined with kraft paper. The shipper was responsible for the stowing of the bags within the containers which were delivered to the carrier in sealed condition. Prior to the loading of the coffee, samples were taken which disclosed that the coffee was firm, green, in good condition, of the highest quality and suitable for export.

On December 29, 1984, Netumar issued clean bills of lading acknowledging receipt of the 3,000 bags of coffee in apparent good order and condition. The S.S. Maria Auxiliadora proceeded northward. The captain of the vessel testified by deposition that no ventilation was afforded the coffee for the period January 13th through January 27th, the date of discharge in Montreal. The vents were kept closed to avoid water or moisture entering the holds of the vessel where the containers were stored and to protect against the sudden drop in outside temperature during the period January 19th through January 27th when the vessel entered northern waters. Upon arrival at Montreal on January 26th, the containers were unloaded from the vessel in temperatures of −6 degrees celsius and were not permitted to cool gradually in a warehouse facility available in the container area but were sent directly to a train where they were loaded on flat beds for transit to Toronto. The coffee was delivered at Toronto to plaintiff's customer, Barzula, between January 30th and February 11th, and upon receipt of the cargo, Barzula protested its damaged condition.

Surveys were taken on behalf of the plaintiff, plaintiff's insurer and the ocean carrier. The causes of this damage, the extent of the damage and the responsibility for causing it, were some of the principal issues disputed by the parties.

It is not disputed that there was some water damage to a portion of the cargo. FM surveyors, Harris, Harding & Bickers, first surveyed the coffee at Barzula's premises on February 7th, 1985 and, after examining a random sample taken from the first eight containers out of the total of twelve, noted that beans were not of uniform green-grey color but instead were discolored, soft, rubbery and gave off a light musty odor. Further, it appeared that the beans were swollen beyond their original size, a condition brought about by the absorption of water. Later testing disclosed that there was no salt water present which led to the conclusion, not seriously disputed at the trial, that the cause of the water damage was condensation. Although FM's surveyor had initially advanced the suggestion that the condensation loss might have occurred as a result of higher than normal moisture content in the coffee beans when containerized at the point of origin, after further lab reports he withdrew that suggestion and concluded that the damage occurred strictly due to condensation formation within the containers, resulting from other causes.

Efforts were made at this time to reach an agreement with Barzula, who claimed that he had an urgent need for the coffee to keep his roasting plant in operation and insisted that the quality of the coffee was unacceptable. It was then determined with the concurrence of the surveyors for all parties and of FM that the 3,000 bags of coffee should be shipped to New York for purposes of salvage. It appears, however, that Barzula, doubtless because of its need for coffee to reopen its roasting plant, in fact, retained 1,000 bags of coffee. Plaintiff began an arbitration proceeding against Barzula which was settled.

In New York, further testing by coffee experts was done and the defendants now take the position that the extent of damage was less than had been perceived in Toronto and that the damage affected only the coffee which was stored in the perimeters of the containers and therefore subjected to greater temperature changes.

Plaintiff, however, urges with considerable persuasiveness, that it relied on the surveys taken in Toronto and the evaluation of the cargo damage made by FM's surveyor. It was based on these evaluations that plaintiff agreed to reshipment of the coffee to New York and to the settlement of its arbitration with Barzula. We need not, however, resolve the question whether the defendants would be estopped from denying that the coffee was in fact damaged to the extent initially estimated because we find, based on the documentary evidence and the survey reports, that there was indeed extensive damage to the coffee which affected not only its appearance, but more crucially, its taste.

Plaintiff, having established that it loaded cargo in good condition and that the cargo was in damaged condition on outturn, has made a *prima facie* case under the all-risk policy against FM and as against the carrier. No exceptions to the policy nor to the liability of the carrier have been shown. This brings us to the only two issues which warrant any extended discussion.

Plaintiff's policy with defendant FM called for calculation of loss pursuant to a "particular average" or "P.A." adjustment. Such a calculation is made by taking the sound market value of the cargo in question and comparing it to the value of the damaged cargo. The percentage derived by this comparison is then applied to the insured value to measure the loss. Defendant FM urges that this is the method to be employed in the calculation of damages in this case. However, prior to its coverage by FM, plaintiff was insured by Insurance Company of North America. The Insurance Company of North America policy contains an adjustment clause which provided that "any loss hereunder shall be adjusted on a salvage-loss basis" (*i.e.*, insured value, less the eventual net proceeds received by the assured after deduction of all expenses). The superseding FM policy provided in paragraph 38(X):

"Notwithstanding anything contained herein to the contrary, it is understood and agreed between this Company and the Assured that this policy provides coverage * as broad as, or where so stated broader than that provided under previ-

ous policy of the Insurance Company of North America, policy No. 488713 and which is on file with this Company at policy inception, the terms and conditions of which are deemed incorporated herein."

\* As applicable to shipments of coffee and tea, only.

Plaintiff contends that the effect of this paragraph 38(X) is to incorporate by reference the loss calculation provisions of the INA policy, application of which results in a significantly higher damage evaluation than the particular average provision of the FM policy standing alone.[1] FM, however, takes the position that the sole function of paragraph 38(X) was to provide "coverage" as broad as that in the INA policy and that coverage relates solely to the nature of the risks insured rather than the method of calculating the loss.

No party has furnished any helpful authority on this question and our independent research has not uncovered any pertinent authority. There is some force to FM's argument that coverage is a term used to describe risks rather than calculation of damages. However, the term is not free from ambiguity. One has often heard persons having deductibility clauses in insurance policies express the view that they were not "covered" to the extent of the deductible provision. The practice of incorporating by reference a prior policy and providing for equally broad coverage is a short cut taken by the draftsman and the parties which invites subsequent disputes of this nature. We think it appropriate that such ambiguities be resolved against the insurance company writing the policy. Further, we note plaintiff's claims that FM initially rejected the claim on a salvage-loss basis and that its resort to "particular average" is a mere afterthought. We conclude that the proper measure for damages is the salvage claim calculation as reflected below.

### The Liability of Netumar

Netumar is sued directly by the plaintiff and as cross-claim defendant of FM. Netu-

mar asserts that it furnished a seaworthy ship and that no basis for imposition of liability against it has been shown. We disagree. We have found that the plaintiff established the delivery of goods in sound condition and that they were out-turned in damaged condition. No exceptions to carrier liability have been shown.

It appears that when the cargo was discharged in Montreal awaiting shipment to Toronto, the containers were not permitted to cool gradually in a warehouse but were subjected to the radical drop in temperature occasioned when they were brought from the hold in which they were loaded in tropical Brazil to the exposed deck in the Canadian winter. It seems probable that it was during this period of time that the serious condensation problems developed. The absence of visible water stains on the coffee bags themselves may have resulted from the fact that there was a rapid freezing rather than a gradual saturation. Netumar was responsible for the cargo until its delivery to the consignee in Toronto and is therefore liable for the damage to the coffee which we find resulted from the handling of the cargo from the time of the arrival of the S.S. Maria Auxiliadora in Montreal to the delivery of the cargo to Toronto. Netumar points out that there was other coffee aboard the S.S. Maria Auxiliadora other than that involved in this litigation and that no claims of damage to cargo have been asserted with respect to those other coffee consignments. However, it does not appear that any of the other coffee shipments were subjected to the post-discharge handling of the cargo in question and we therefore find that the absence of any other claims is irrelevant.

### Damages

We find that plaintiff is entitled to recover against FM the damages set forth in its revised Statement of Claim (Exhibit 37) in the amount of $142,140.71. We find that this claim accurately reflects the damages sustained by the plaintiff and gives the

1. Calculated on a "particular average" adjustment, plaintiff's claim against FM would be $110,794.92. Thus, the difference between a salvage value adjustment which would be $142,140.71 and a "particular average" adjustment is approximately $31,000.

appropriate adjustment for the allowances made to Barzula and the adjustment received as a result of the Brazilian government's subsidy (IBC). We find that the plaintiff was entitled to recover the costs and expenses for loading and trucking to New York and that any agreement made between FM and its broker with respect to an allocation of these costs was not binding upon the plaintiff.

Plaintiff's damages against Netumar must be calculated in a different fashion. For purposes of its claim against its insured, plaintiff properly relies on the insured value of $627,660 or $1.585 per pound. However, since plaintiff had presold the coffee to Barzula at $1.54 per pound, it cannot and does not seek to recover a greater amount from the carrier. This adjustment results in plaintiff's damages against Netumar in the amount of $129,-145.86.

### Conclusion

Plaintiff shall have judgment against FM in the amount of $142,140.71, and against Netumar in the amount of $129,145.86.

Defendant FM may recover against Netumar on its cross-claim for indemnity.

Submit order.