SIDERIUS, INC., Plaintiff–Appellee, Cross–Appellant,

v.

M.V. "AMILLA", her engines, boilers, etc. Astramar Cansac, B.S. A.S. and Amilla Compania Naviera, S.A. and Canadian Forest Navigation Co., Ltd., Defendants,

Astramar Cansac B.S. A.S., Defendant–Appellant,

Amilla Compania Naviera, S.A., Defendant–Appellee, Defendant–Appellant.

AMILLA COMPANIA NAVIERA, S.A.; Third–Party Plaintiff–Appellee, Third–Party Plaintiff–Appellant,

v.

CANADIAN FOREST NAVIGATION CO., LTD., Third–Party Defendant–Appellant, Third–Party Defendant–Cross–Appellee.

Nos. 922, 739 and 842, Dockets 88–7880, 88–7884 and 88–7898.

United States Court of Appeals, Second Circuit.

Argued March 8, 1989.

Decided July 19, 1989.

Michael O. Hardison, New York City (Poles, Tublin, Patestides & Stratakis, John G. Poles, New York City, of counsel), for defendants-third-party plaintiffs-appellants.

Thomas L. Tisdale, New York City (Dougherty, Ryan, Mahoney, Pellegrino & Zambito, Robert J. Giuffra, of counsel), for defendants-third-party defendant-appellant and third-party defendant-cross-appellee.

Roman Badiak, New York City (Badiak & Will, of counsel), for plaintiff-appellee cross-appellant.

Before KAUFMAN, CARDAMONE, and PRATT, Circuit Judges

CARDAMONE, Circuit Judge:

Defendant Amilla Compania Naviera, S.A. (Amilla) and defendants Astramar Cansac B.S. A.S. and Canadian Forest Navigation Company, Ltd. (collectively Canadian) appeal from the October 4, 1988 judgment after a bench trial before the United States District Court for the Southern District of New York (Carter, J.), finding Amilla liable for damages to goods in transport, and further regarding Canadian to indemnify Amilla for 50 percent of the damages. We affirm.

## FACTS

Amilla is the owner of the M/V Amilla (the Ship), a bulk carrier sailing under the Greek flag, that was chartered on August 4, 1983 to Canadian pursuant to a New York Produce Exchange form time charter party. The charter party provided that Amilla would ensure that the ship was "in every way fitted for ordinary cargo service," and that Canadian would "pay for all provisions, wages and consular shipping and discharging fees of the crew."

Through defendant Astramar, whose performance was guaranteed by defendant Canadian, the ship was then voyage-chartered to plaintiff Siderius for the transport of rolled steel sheets from Buitrago, Argentina to Detroit, Michigan and Chicago, Illinois. This cargo, encased in metal envelopes, was inspected by Siderius' surveyor before it was loaded aboard the ship in Buitrago, and the coils destined for Detroit were then reinspected upon arrival.

Because the metal envelopes were not opened, the steel sheets themselves could not be inspected. Several weeks later, the cargo inside the envelopes was inspected when one of Siderius' customers rejected some of the sheets due to water damage. Siderius then examined the sheets remaining in storage and found significant rust.

It issued a credit to the customer who had complained and then brought this action against Canadian and Amilla, claiming that the rust damage was caused by defendants during the transport from Argentina to Detroit.

At a bench trial, the district court examined the charter agreements, and heard evidence on the inspection of the steel during loading in Argentina, on the events that occurred during the ship's voyage—including the ventilation of the holds where the steel was stored—and on the inspection and storage of the sheets upon arrival in Detroit on September 18, 1983. It made the following determinations. First, the United States Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. §§ 1300–1315 (1982 & Supp. IV 1986), governed the dispute, and under the definitions set forth in the Act, Amilla was the ship's owner and Canadian was its charterer. Second, Siderius, by showing delivery of the steel to the carrier in good condition and damage to the steel on outturn, had made out a *prima facie* case, thereby shifting the burden to defendants to prove that the rust damage did not occur during the ocean voyage. Third, defendants did not meet this burden; therefore, they were liable for the damage to the steel. Fourth, because the ship carried no equipment for measuring the condensation level or humidity in its holds, and in light of substantial evidence showing significant condensation in the holds, the ship was unseaworthy to carry the steel cargo safely.

After hearing evidence on the value of the steel before and after the rust damage, the district court awarded Siderius $95,-276.01 with interest plus costs to be taxed. In determining how the payment of these damages should be apportioned between defendants, the court looked to the New York Produce Exchange Interclub Agreement (Interclub Agreement or Agreement), a well-known, long-established agreement specifically identified in the charter party as the document that would govern the settlement of any disputed cargo claims. The district court applied the clause of this Agreement which specified that payment of "condensation damage" should be appor-

tioned 50 percent to the owner of the vessel and 50 percent to the charterer, and ordered Canadian to indemnify Amilla for half of the $95,276.01 awarded to Siderius, or $47,638.00 plus costs. Both Amilla and Canadian have appealed.

## DISCUSSION

We consider each appellants' arguments separately.

### A. *Amilla's Claims*

Amilla contends principally, first, that plaintiff Siderius failed to make out a *prima facie* case; second, that the district court's finding that the ship was unseaworthy is clearly erroneous; and third, that the district court erred in holding it liable as a vessel owner under the COGSA. Each of these claims lacks merit.

■ We hold at the outset that Siderius did make out a *prima facie* case. As Judge Carter properly recognized, Siderius could meet its initial burden by showing either through circumstantial or direct evidence "that the damage was caused by the carrier's negligence and not by any inherent vice of the cargo." *Elia Salzman Tobacco Co. v. S.S. Mormacwind,* 371 F.2d 537, 539 (2d Cir.1967); *see also Philippine Sugar Cents. Agency v. Kokusai Kisen Kabushiki Kaisha,* 106 F.2d 32, 37 (2d Cir.1939). Here, there is sufficient evidence of such negligence, including the indications of drip down on the cargo, testimony by the chief mate that he could not specifically list or document the number of times when the ship's holds were ventilated during the voyage, and the discovery of rust when the hatches were opened in Detroit. The burden then shifted to the defendants, and we agree with the district court that defendants failed to present credible evidence that rust was present initially.

■ Next, we cannot conclude that the district court's finding that the ship was unseaworthy was clearly erroneous. The court's determination was supported by ample evidence, including the fact that the

ship had no hygrometer or similar moisture measuring device aboard, that its ventilation system was hand activated, and that significant "drip down" occurred during the voyage, resulting in substantial rust damage. We therefore adopt the court's finding that "the vessel was not adequately equipped to safely carry the cargo in question."

Finally, we agree with the district court's determination that Siderius may recover directly from Amilla, given that the ship was unseaworthy. We have long held that "when the charterer of a ship is liable to a cargo owner," and that liability results because the vessel owner has violated its warranty of seaworthiness, the "cargo owner may hold the shipowner on his warranty to the charterer." *New York Cent. R.R. v. New York, N.H. & H.R.R.*, 275 F.2d 865, 866 (2d Cir.1960). Here Amilla warranted to Canadian that the ship would be "in every way fitted for ordinary cargo service," that is, that it would be seaworthy. *See Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 332 (2d Cir.1972) ("One essential aspect of seaworthiness is that the vessel must be fit for the purpose intended under the charter party."); *Demsey & Assocs. v. S.S. Sea Star,* 461 F.2d 1009, 1016 (2d Cir.1972) (stating that vessel owner, in agreeing to provide ship that was "tight, staunch, strong and in every way fitted for the service" made implied warranty of seaworthiness to charterer). But Amilla then breached that warranty by providing an unseaworthy ship. Consequently, well-established rules of admiralty law provide that Siderius may recover directly from Amilla. *See New York Cent. R.R.,* 275 F.2d at 866; *S.C. Loveland Co. v. Eastern States Farmer's Exch.,* 92 F.2d 180, 181 (3rd Cir.), *cert. denied,* 302 U.S. 762, 58 S.Ct. 369, 82 L.Ed. 591 (1937); *Davis v. Dittmar,* 6 F.2d 141, 142 (2d Cir.1925).

Hence, we affirm the district court's decision holding Amilla liable for the damage to the steel rolls.

## B. *Canadian's Claim Regarding the Interclub Agreement*

### 1. *Proceedings in the District Court*

Canadian's argument arises out of what it claims was unfair handling of the Interclub Agreement. For our purposes, the relevant clause of this Agreement may be divided into two portions. The first reads as follows:

> In all cases where the Agreement applies cargo claims shall be apportioned as hereunder:
>
> > Claims for loss of or damage to cargo due to unseaworthiness—100% Owners
> >
> > Claims for damage (including slackage/ullage) due to bad stowage or handling—100% Charterers

The second portion of the clause, appearing immediately below the first, states:

> Except as provided in the succeeding paragraphs of this clause, short delivery claims (including pilferage), claims for overcarriage, and claims for condensation damage—50% Owners
>
> 50% Charterers
>
> \*    \*    \*    \*    \*    \*
>
> Claims for condensation damage shall be apportioned as provided in the first paragraph of this clause, except where there is clear evidence that the damage was due solely to bad stowage in which event such claims shall fall 100% to Charterers [sic] account but where there is clear evidence that the damage resulted solely from improper ventilation, such claims shall be borne 100% by Owners.

Canadian argues that it was prepared to offer expert testimony on these provisions to show that, as the charterer, it should not be ordered to indemnify the ship owner Amilla for the condensation damage. But Amilla did not introduce the Interclub Agreement in evidence at trial, and the district court gave no advance indication that its decision might rest on it. Consequently, Canadian did not introduce the Agreement or call its expert.

It was only in Amilla's post-trial brief that the indemnification provisions of the Interclub Agreement were raised for the first time. In this brief, rather than quoting the entire indemnification clause, Amilla only paraphrased the second portion, omitting any mention of the "unseaworth-

iness" clause which, Canadian argues, would have required Amilla to shoulder 100 percent of the damages. Amilla then urged that under the portion of the clause it had paraphrased, the condensation damage should be apportioned equally between Amilla and Canadian, unless the court found "clear evidence" that the damage resulted from improper stowage or ventilation.

Several months later, when the district court rendered its decision, its determination of the indemnification issue quoted only the language paraphrased in Amilla's posttrial brief. Finding no "clear evidence" that the condensation resulted from improper stowage or ventilation, the court held that the Interclub Agreement required that the damages be apportioned between the defendants on a 50 percent basis.

Canadian moved for reconsideration of the indemnification issue claiming (1) it had been given no opportunity to present its expert evidence concerning the overall applicability of the Agreement's provisions, and (2) it had no way of determining whether the court had been aware and considered the "unseaworthiness" portion of the Interclub Agreement because the Agreement had not been in evidence before the court and Amilla had paraphrased only part of the indemnification clause in its brief. In response, Amilla conceded that the Interclub Agreement was not in evidence before the district court judge, but asserted that the provisions in the Agreement were adjudicative facts of which a court could properly take judicial notice. In reply, Canadian countered that if the district court had judicially noticed the Agreement, Canadian was entitled to a hearing pursuant to Fed. R.Evid. 201(e).

The district court denied the motion for reconsideration on the grounds that Canadian was "in effect rearguing issues already submitted to and considered by the court." The district court endorsement did not indicate whether it had in fact judicially noticed the Agreement and it did not discuss the "unseaworthiness" provisions of the Agreement. Canadian's request to the trial court to reconsider was unsuccessful.

## 2. *Judicial Notice*

■ The issue for us on appeal is the same as it was before the district court on both requests for reconsideration—whether the district court could rely on the Interclub Agreement. We hold that at this bench trial the district court properly relied on the Interclub Agreement and correctly applied it to the facts of the case before it. Thus, there is no need for a remand to afford Canadian a hearing on whether the Interclub Agreement should be noticed and whether additional evidence is required to apply its provisions.

Paragraph 60 of the August 4, 1983 Charter Party states that "[c]argo claims to be settled in accordance with New York Produce Exchange Interclub Agreement." As reprinted in 2B *Benedict on Admiralty* Form No. 7–12B, at 7–82.11 (1989) (*Benedict*), the Agreement's preamble provides that it is a "Memorandum of Agreement ... as to the apportionment of liability for cargo claims...." The parties' election to incorporate the Interclub Agreement is analogous to parties specifying what law or procedures will govern potential disputes. The Agreement is arguably more like law —to which Rule 201 has no application— than it is to an adjudicative fact. It is axiomatic that Rule 201 of the Federal Rules of Evidence "deals only with judicial notice of 'adjudicative' facts." Fed.R.Evid. 201(a) advisory committee's note; *see also* 21 C. Wright and K. Graham, *Federal Practice and Procedure* § 5102 at 462 (1977) (*Wright*) ("To the extent that judicial notice of law remains a viable concept, it is presently unregulated by the Federal Rules."); Morgan, *Judicial Notice*, 57 Harv.L.Rev. 269, 270 (1944) ("In determining the content or applicability of a rule of domestic law, the judge is unrestricted in his investigation and conclusion."). The federal rules give no guidance on how to distinguish law from adjudicative fact for purposes of judicial notice, and noted commentators have called the question "baffling." *See Wright, supra,* § 5103, at 473.

Even assuming *arguendo* that the Agreement is an adjudicative fact, the

strictures of Rule 201 were satisfied. At the outset we observe that the Interclub Agreement could be judicially noticed because it was "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). As the Interclub Agreement is reprinted in treatises widely used in the maritime industry, such as *Benedict*, it passes that test.

Further, it does not follow that because the Agreement could be judicially noticed, it must be so noticed for the decision below to stand. It is important to distinguish between those situations when a court takes judicial notice of facts extraneous to a record, and when it takes notice of facts that are integrally related to the record. In the former situation, Rule 201 serves a critical function of giving notice to the party who could be prejudiced by a court's, without warning, taking judicial notice. Such is not this case. The Interclub Agreement was incorporated by reference into one of the parties' key joint exhibits—the August 4, 1983 Charter Party that Canadian signed. Thus, the Agreement is not a fact extraneous to the record; it was a part of it. In view of Canadian's conceded knowledge, the fairness notion that animates Rule 201 was served.

Inasmuch as Canadian chose to allow the Interclub Agreement to govern this dispute and made a tactical decision not to argue its provisions at trial, it is not entitled to a hearing. An opponent who lacks knowledge that a court will take judicial notice may request a hearing regarding such action, even after judicial notice has been taken. *See* Rule 201(e) advisory committee's note. But because we hold that Canadian had effective notice of the Agreement before and during the trial, its post-trial request for a hearing was untimely.

The values of completeness and accuracy that underly Rule 201 were also served here. Canadian argues that, at the time it rendered its decision, the district court had only a snippet of the Interclub Agreement, as reprinted in Amilla's post-trial brief. This argument borders on the frivolous because the district court, as did the parties, had easy access to the complete Interclub Agreement in familiar maritime sources such as *Benedict.*

■ Further, the Interclub Agreement was correctly applied, satisfying Rule 201's goal of accuracy. The district court found circumstantial but not clear evidence that poor ventilation caused the damage to the coils. But before Amilla could be held 100 percent liable—allowing Canadian to avoid damages—the Agreement requires a finding of clear evidence that poor ventilation caused the damage. Otherwise, the damage is apportioned on a 50/50 basis. Canadian argues that it can avoid contribution due to the district court's finding of unseaworthiness and the clause of the Agreement that states: "Claims for loss of or damage to cargo due to unseaworthiness—100% Owners." This argument is meritless. Although the district court did find that the *Amilla* was unseaworthy, it did not find that the unseaworthiness *caused* the damage to the cargo. The finding of unseaworthiness suggests that the ship's unseaworthiness might have contributed to the damage, an inference which dovetails with the district court's conclusion that circumstantial, but not clear, evidence pointed to poor ventilation as the cause of the condensation, suggesting that poor ventilation may not have been the sole cause. Consequently, the 50/50 split between Amilla and Canadian is the most equitable apportionment of liability on these facts and is also the result that adheres most closely to the wording of the Interclub Agreement that the parties agreed would govern.

## CONCLUSION

In light of the district court's findings—which were not clearly erroneous—and its correct application of the Interclub Agreement, we agree that Canadian should pay 50 percent of the damages. Accordingly, the judgment appealed from is affirmed in all respects.

Judgment affirmed.

PRATT, Circuit Judge, dissenting:

I concur in Part A of the majority opinion. Siderius made out a prima facie case against Amilla; the finding by the district court that the ship was unseaworthy is not clearly erroneous; and the district court's determination that the ship was unseaworthy allowed Siderius to recover its resulting damages directly from Amilla.

However, I respectfully dissent from Part B of the opinion, because Canadian was denied a fair opportunity to present its full case against Amilla on the indemnity issue.

At trial Canadian, defending against both the complaint of plaintiff Siderius and the third-party claim of defendant Amilla, had to walk a fine line. Defeating plaintiff Siderius's overall claim would mean victory for all defendants; but if Siderius should succeed, then Canadian would have to defend against Amilla's indemnity claim. Thus, Canadian had to decide whether or not to present its own expert evidence that the cargo damage was caused by unseaworthiness of the vessel. To present that evidence would, of course, have strengthened Canadian's defense against any claim by Amilla for indemnity based upon the interclub agreement, but at the same time it would have strengthened plaintiff Siderius's overall case. Its dilemma was resolved, Canadian thought, when Amilla rested its case without offering the interclub agreement in evidence or even claiming to rely on the indemnification provision of the agreement. Without an evidentiary basis for liability based on that agreement, Canadian felt it was free of any liability for indemnification based on that ground. Canadian therefore did not present the additional expert evidence it had available on the unseaworthiness issue.

In its decision, however, the district court did rely on the interclub agreement-specifically the court relied on a single provision that Amilla had paraphrased in its posttrial memorandum. Viewed in isolation, that provision seems to call for a 50–50 split of liability between owner and charterer unless there is "clear evidence" that the damage was caused by unseaworthiness. The

district court's reliance on this clause, without notice or warning to anyone, effectively denied Canadian an opportunity to establish "clear evidence" on the seaworthiness issue. Because there was only a "preponderance" of evidence rather than the "clear evidence" required by the interclub agreement, the district court imposed 50% of the liability on Canadian. In the context of this case, that result was unfair.

In the first place, the interclub agreement was never placed in evidence. While it was incorporated by reference into one of the trial exhibits, it was not presented to the court in its entirety. The district court could properly have taken judicial notice of it, because the document was generally in use in the trade and was readily available from undisputed sources. It was improper, however, for the district court to deny Canadian an opportunity to be heard on (1) whether other provisions in the agreement might modify the impact of the single clause it relied upon, (2) whether certain conditions in the agreement properly had been fulfilled, and (3) whether the generally accepted interpretation of the agreement supported the judge's application of it. Nor, of course, was Canadian permitted an opportunity, assuming the district court's interpretation of the agreement was correct, to present its "clear" evidence that the damage was caused solely by unseaworthiness.

The majority contends that because Canadian was aware of the potential relevance of the agreement, it did have an "opportunity" to present the required evidence. Such a position unwisely tends to undercut the standard operating procedures in most of our district courts that are designed to narrow issues and confine evidence only to those matters that are in dispute.

Further, since the interclub agreement was not placed in evidence, the only way it could properly have been considered by the district court was through judicial notice. Whether the agreement be viewed as "adjudicative fact" and therefore subject to rule 201 of the Federal Rules of Evidence, or whether it be viewed as a form of pri-

vate law as suggested by the majority, fundamental fairness requires that the court give the parties an opportunity to be heard as to the propriety and import of judicially noticing the proposed material.

As Judge Weinstein points out, "What is important is that procedural fairness demands that the parties have an opportunity to object to the taking of notice." 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 201[07], at 201–50 (1988). Notice is the explicit requirement before judicially noticing adjudicative facts, Fed.R.Evid. 201(e) ("A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed."), and even matters of foreign law. Fed.R.Civ.P. 44.1 ("A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice."). Notice should also be provided when a court proposes to take notice of legislative facts, 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 200[03], at 200–16 (1988) ("Informal consultation with the parties enables the court to enlist their aid in obtaining further information, guarantees that differing points of view will be consulted, and is especially appropriate in those cases where the fact the judge is noticing may have adjudicative as well as legislative implications."). Why the need for fairness and notice disappears where, as here, a provision of private law is judicially noticed, simply escapes me.

No advance warning was given to Canadian's counsel that the court would judicially notice the agreement. Once it appeared in the final decision that the trial court had relied on the agreement, Canadian's motion for reargument should have been granted. *See* Fed.R.Evid. 201(e) ("In the absence of prior notification, the request [for an opportunity to be heard] may be made after judicial notice has been taken."). Fairness required that Canadian be given the opportunity to present its additional evidence in order to meet the new, higher burden of "clear evidence" imposed by the agreement.

Finally, the entire area of judicial notice is pervaded with distinctions that have proved difficult to apply, *e.g.*, matters of law versus matters of fact, foreign law versus domestic law, legislative fact versus adjudicative fact, critical facts versus peripheral facts. To this array the majority has now added another distinction: "facts extraneous to a record" versus "facts that are integrally related to the record". Because it views the interclub agreement not as "extraneous", but as "integrally related" to the record, the majority apparently concludes, first, that the agreement was automatically before the court, even though not in evidence and not relied on by anyone at trial, and, second, that Canadian had no right after the decision was rendered to be heard on the propriety of taking judicial notice of the agreement or to present the additional evidence that was essential to defeat the indemnity provision of the agreement. No authority is given, nor have I found any, which supports this extraneous/integrally related analysis. It can't be found in rule 201, which applies to adjudicative facts, nor does it comport with the judicial notice doctrine as applied to matters of foreign or private law. Indeed, it seems to run counter to the critical fact/peripheral fact distinction urged in Wright and Graham. *See* 21 C. Wright & K. Graham, *Federal Practice and Procedure* § 5103, at 477–79 (1977 & Supp.1988).

Putting aside the semantic distinctions, however, judicial notice in general is a doctrine that seeks to balance economy in the presentation of information to the court with fairness to the parties. On the district court's determination of Amilla's indemnity claim against Canadian in this case, that balance was skewed. Because Canadian did not receive a fair trial on the indemnity issue, the judgment against it should be reversed with a remand for further proceedings.