ARKWRIGHT MUTUAL INSURANCE COMPANY a/s/o Rickel Home Centers Division of Supermarkets General Corporation, and Supermarkets General Corporation, Plaintiffs,

v.

The M.V. ORIENTAL FORTUNE, her engines, boilers, etc., and Kawasaki Kisen Kaisha, Ltd. (K–Line) and Neptune Orient Lines, Ltd., Defendants.

NEPTUNE ORIENT LINES,
Third–Party Plaintiff,

v.

ORIENT OVERSEAS CONTAINER LINE, INC., Third–Party Defendant.

KAWASAKI KISEN KAISHA, LTD. (K–LINE), Third–Party Plaintiff,

v.

ORIENT OVERSEAS CONTAINER LINE, INC., Third–Party Defendant.

ARKWRIGHT MUTUAL INSURANCE COMPANY a/s/o Rickel Home Centers Division of Supermarkets General Corporation, and Supermarkets General Corporation, Plaintiffs,

v.

The M.V. ORIENTAL FORTUNE, her engines, boilers, etc., and Kawasaki Kisen Kaisha, Ltd. (K–Line), Defendants and Third–Party Plaintiffs,

v.

ORIENT OVERSEAS CONTAINER LINE, INC., Third–Party Defendant.

Nos. 88 Civ. 6462(RLC), 88 Civ. 2823(RLC).

United States District Court, S.D. New York.

Aug. 27, 1990.

Purrington & McConnell, New York City, for plaintiffs; John H. McConnell, of counsel.

Lilly, Sullivan, Purcell, Barkan, & Junge, P.C., New York City, for defendants Orient Overseas Container Line and M.V. Oriental Fortune; Stephen L. Barkan, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant and third-party plaintiff Kawasaki Kisen Kaisha, Ltd.; Kevin L. Barron, J. Scot Provan, of counsel.

Mahoney & Keane, New York City, for defendant and third-party plaintiff Neptune Orient Lines, Ltd.; Edward Keane, of counsel.

## OPINION

### ROBERT L. CARTER, District Judge.

Arkwright Mutual Insurance Company ("Arkwright") is an insurance company with offices in Massachusetts. It was the insurer under a blanket cargo policy held by Supermarkets General Corporation ("Supermarkets") on the shipments of goods on Voyages 7 and 8 of M/V Oriental Fortune which are the subject of this litigation. Arkwright has paid the loss claimed by the insured and brings this action to recover from defendants, Kawasaki Kisen Kaisha, Ltd. ("K–Line") and Neptune Orient Lines ("NOL"). These two carrier defendants have in turn brought third-party actions against a third carrier, Orient Overseas Container Line, Inc. ("Orient"), the owner of the M/V Oriental Fortune. K–Line and NOL are foreign corporations doing business in the Southern District of New York. Orient is a corporation with offices in the Southern District of New York. There was a three day bench trial May 10, 11 and 14.

## FACTS

K–Line, NOL and Orient are parties to a space charter contract, pursuant to which each carrier has shares of space on each others' vessels, and each carrier issues its own bills of lading for container slots used on the others' ships. Under the space charter each carrier is responsible for the keep and care of its own containers and goods before loading and after discharge. Any dispute among them as to responsibility for damage to cargo is to be privately arbitrated.

In February, 1988, two containers of electrical ceiling fans were placed on board the M/V Oriental Fortune at the port of Hong Kong pursuant to bills of lading of NOL, and a few days later two containers of ceiling fans were loaded on board the M/V Oriental Fortune at the port of Kaohsiung pursuant to bills of lading of K–Line. The M/V Oriental Fortune was en route to New York on Voyage 7. In April, 1988, a container of ceiling fans was received on board the M/V Oriental Fortune pursuant to bills of lading issued by K–Line for

carriage of the cargo to New York on Voyage 8.

The bills of lading were house-to-house, which means that the containers were loaded by the shipper at its own facility in Hong Kong and outside Kaohsiung and sealed. The sealed containers were then delivered to the vessel and carried to New York. At New York the sealed containers were off-loaded, picked up by truckers of the consignee, Supermarkets, and delivered to its warehouse in New Jersey.

The fans were shipped in cartons, each box containing a fan body, light kit, blades, hardware, etc., and packed in styrofoam and cardboard. Each package contained a silicone gel desiccant packet and instructional material. The exterior box was imprinted with merchandising data and wrapped with shrink wrap.

The four containers on Voyage 7 were delivered to the distribution center of Supermarkets between March 8th and March 14th. When the containers were opened dampness on the ceilings and walls of the four containers could be seen. On entry into the containers water on the floors was encountered. The cartons were wet and discolored. Nine containers of fans consigned to Supermarkets arrived on this voyage, but the merchandise suffered damage only in the four containers involved in this litigation.

John Bradley, who personally inspected the merchandise when the four containers were unsealed, testified that some of the cartons were stained and discolored "where the red was coming into a yellow shade, and it was wet all over the product. Some of the cartons felt like that (sic) they were crumbling." Tr. at 42.

The container on Voyage 8 which was delivered to Supermarkets' warehouse on May 15, 1988, was old and there was a breach of its exterior wall. This container was wet on the ceiling, walls and floor. Bradley testified that "you could see discoloring on the cartons. On the side you [could] see water and feel the wetness of the cardboard, and inside some of the cellophane ... you could put your fingers in there and feel the dampness and wetness."

Tr. at 49. Some of the fans showed signs of rust and corrosion.

Although surveyors recommended that the merchandise be segregated, the damaged from the undamaged, Supermarkets decided to turn the whole lot over to salvage, except for 476 units from one of the K–Line containers on Voyage 7. Its rationale for this decision was that in view of the low price for which it could sell the fans—$29.95 to $49.95—it would not be economically feasible to undertake the expense that segregating and repackaging the fans would require. There was concern also about selling wet electrical products to customers.

12,458 units were delivered to George M. Ruddy & Co. for salvage. 10,138 of these units were from the containers on Voyage 7. Part of the agreement with Ruddy was that it would not attempt to sell the fans in the northeast area where Supermarkets does business. The salvor returned net proceeds of $133,931.90 for the fans on Voyage 7, and $37,152.60 net proceeds for fans on Voyage 8.

The insurer paid Supermarkets under the blanket cargo policy $135,104.57 for the loss incurred in connection with the cargo on Voyage 7 and $51,364.60 for the loss incurred in connection with the cargo on Voyage 8.

No evidence was presented concerning the condition of the fans when loaded and sealed in the containers by the shippers in Hong Kong and Kaohsiung. No evidence was presented concerning the stowage of the containers or their care and condition during the voyages at issue, except that there was testimony that the containers on Voyage 7 were stowed below deck and the container on Voyage 8 was stowed on deck.

Although defendants sought to suggest that there was fault in the packaging of the cargo by the shipper, the packaging was the usual and customary, and ordinarily fit for carriage by sea. There was nothing inherent in the merchandise itself or in its packaging that would itself produce moisture, rust or corrosion.

Defendants introduced the testimony of a meteorologist, Dr. Austin Dooley, to the effect that between January 31 and February 15, 1988, the weather in Hong Kong and Kaohsiung was hot and humid, with intermittent haze and fog. Similar weather was reported in those areas during the period April 1, to April 15, 1988.

## DETERMINATION

 Under the Carriage of Goods by Sea Act, 46 U.S.C. § 1300, *et seq.* ("COG-SA"), a shipper establishes a prima facie case by showing receipt of the cargo by the carrier in good condition and outturn at destination in a damaged state. *See, e.g., Nissho–Iwai Co. v. M/T Stolt Lion,* 617 F.2d 907, 912 (2d Cir.1980); *Demsey & Assoc., Inc. v. S.S. Sea Star,* 461 F.2d 1009, 1014 (2d Cir.1972). Generally an on-board clean bill of lading satisfies the good condition requirement at the time of shipment. *Emmco Insurance Co v. Wallenius Caribbean Line, S.A.,* 492 F.2d 508, 513 (5th Cir.1974). Where the cargo is delivered in sealed containers, the bill of lading merely attests to the apparent good condition of the cargo and the burden is on the shipper to establish that the cargo was delivered in good condition. *Vana Trading Co. v. S.S. Mette Skou,* 556 F.2d 100, 104 (2d Cir. 1977).

 The cargo was containerized in a manner which prevented the carrier from ascertaining its condition, and there was no direct testimony concerning the good order of the merchandise when the containers were stuffed, or the condition of the cargo in transit to the ports of Hong Kong and Kaohsiung, or on arrival for loading on M/V Oriental Fortune for transport to New York on Voyages 7 and 8. While plaintiff is required to present evidence of the good condition of the cargo when received by the shipper beyond the bill of lading itself, its prima facie case does not depend upon direct evidence as to the actual condition of the cargo prior to shipment. Testimony of the nature of the goods and a showing that the type of damages complained of resulted from carrier negligence and was not attributable to inadequate packaging or negligent loading of the container suffice to meet this initial burden. *Vana Trading Co. v. S.S. Mette Skou, supra,* 556 F.2d at 105, n. 8; *S.M. Sartori, Inc. v. S.S. Kastav,* 412 F.Supp. 1181, 1183 (S.D.N.Y.1976) (Lasker, J.). Indeed, the condition of the cargo upon outturn and the type of damage sustained can be such as to mandate a finding that the cargo was in good order upon shipment. *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 351 (2d Cir.1981); *A.J. Cunningham Packing Corp. v. M/V Australian Exporter,* 719 F.Supp. 258, 260 (S.D.N.Y.1989) (Duffy, J.); *Imperial Commodities Corp. v. S.S. Maria Auxiliadora,* 670 F.Supp. 83, 86 (S.D. N.Y.1986) (Sand, J.).

When the containers were off-loaded and delivered to plaintiff's warehouse and opened for stripping, there was considerable water on the floors, ceilings and side walls of the containers. Some of the cartons were stained and damp; paper inserts were moist and the inside of the containers around the door areas showed signs of rust. Plaintiff's expert testified that based on laboratory analysis, the water damage had to have come from an outside source.

Defendants introduced evidence that weather conditions in Hong Kong and Kaohsiung during the periods in question were hot and humid, with occasional fog and haze to support its thesis that water was introduced into the containers before delivery to the custody of the carrier. While weather conditions at the site of the loading of the cargo into the containers must be taken into account, *Insurance Company of North America v. S/S Italica,* 567 F.Supp. 59, 61 (S.D.N.Y.1983) (Leval, J.), in this case the testimony was not precise. This rather generalized testimony concerning local weather conditions does not account for the considerable amount of water and water damage revealed when the containers were off-loaded and stripped.

Moreover, the local weather testimony given concerned the ports where the containers were taken onto the vessel. While this testimony gives the weather conditions prevailing when the containers were loaded

by the Hong Kong shipper, the containers from Taiwan had been stuffed and sealed prior to being brought to Kaohsiung. Dooley had no report concerning weather conditions at the site where these containers were loaded by the shipper.

In addition, nine other containers of fans from the same shippers were transported to and loaded onto the vessel at the same time as the containers involved in this dispute. The merchandise in these containers reached their destination in an undamaged state. This would seem to weaken drastically, if not rule out, local weather as a factor. The presence at outturn of so much water and water damage in the containers when unsealed bolsters plaintiff's testimony, and I so find that the water damage was caused by the introduction of water into the containers from an outside source during the voyage.

■ On handing the cargo over to the custody of the carrier, it assumes the status of bailee and remains "liable for the cargo's safe delivery." *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 812 (2d Cir.1971). Nonetheless, it is the shipper's burden throughout the trial to prove the damage to its cargo took place while the cargo was in the carrier's custody. *Caemint Food, Inc. v. Brasileiro, supra*, 647 F.2d at 351; *Perugina Chocolates & Confections, Inc v. S/S Ro Ro Genova*, 649 F.Supp. 1235, 1240 (S.D.N.Y.1986) (Leisure, J.). Failure to make such a showing so that it appears as likely as not that the damage took place after discharge, the defendant prevails. *Associated Metals & Minerals Corp. v. M/V Rupert de Larrinaga*, 581 F.2d 100 (5th Cir.1978). Plaintiff has satisfied its burden in this regard. While the evidence is circumstantial that the carrier's negligence caused the damage, such evidence in the circumstances of this case is sufficient. *Siderius, Inc. v. M/V Amilla*, 880 F.2d 662, 664 (2d Cir. 1989).

■ Defendants contend that the plaintiff failed to mitigate its damages. They suggest that plaintiff should have segregated the cartons, repackaged the undamaged ones and sold the damaged ones only to salvage. Plaintiff indicated a lack of any facility for repackaging at its warehouse. Moreover, the price it could charge for the fans was so low that it would not be able to pass on to the customer any extra charges to cover the cost of separating and repackaging in any event.

The burden is on the defendants to show that plaintiff infringed its obligation to mitigate its damages. *Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288, 291 (2d Cir.1961). Since plaintiff has provided a reasonable and satisfactory explanation for its conduct, defendants have not met their burden on this issue. The contention that the plaintiff should have sought bids for salvage and acted improperly in barring the salvor from selling the fans in competition with the plaintiff is unconvincing.

Plaintiff is entitled to recover cost and freight loss. That is $105,612.62 for the loss in connection with Voyage 7. NOL concedes that these damages should be prorated between it and K–Line, with NOL being charged with $63,993.00 of the total amount and K–Line being liable for $41,-680. Plaintiff is to recover an additional $43,318 for its cost and freight loss in connection with Voyage 8. The damages assessed on Voyage 7 carries interest at 9 percent from March 14, 1988, and the damages awarded in connection with Voyage 8 carries interest at 9 percent from May 7, 1988.

Defendants have sued Orient, but have presented no evidence in support of that phase of the litigation. Since their space charter contract provides for private arbitration of any disputes among them (K–Line, NOL, and Orient), it is assumed that the parties intend to resort to arbitration on whatever dispute there is as to Orient's liability for damage to the cargo involved here. At any rate, in the absence of proof, the third party complaints are dismissed.

IT IS SO ORDERED.