SOGEM–AFRIMET, INC., Plaintiff,

v.

M/V IKAN SELAYANG, her engines, boilers, machinery, etc., in rem, Fednav Limited, Pacific Carriers PTE., Ltd., and Chrisholm Trading PTE., Ltd., in personas, Defendants.

No. 93 Civ. 7538 (BN).

United States District Court,
S.D. New York.

Dec. 20, 1996.

430

Kennedy Lillis Schmidt & English, New York City (John T. Lillis, Jr., Thomas C. Murphy, of counsel), for Plaintiff.

Walker & Corsa, New York City (Christopher H. Mansuy, William E. Lakis, of counsel), for Defendants.

### OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge: [1]

Sogem Afrimet, Inc. ("plaintiff") brings this action grounded in Admiralty against Fednav Limited ("defendant") [2]. Plaintiff seeks money damages in the amount of $270,161.49, plus interest and costs, for the marine miscarriage of zircon sand from Brisbane, Australia to Brownsville, Texas. After discharge at Brownsville, plaintiff maintains that there was rust found mixed with the zircon sand. Although attempts were made to purify the sand, plaintiff asserts that because of the contamination, plaintiff's buyers refused to accept the sand. Plaintiff maintains that defendant's failure to properly prepare the vessel's hold was the cause of the rust contamination.

Defendant, a Canadian operator and time-chartered owner of the motor vessel Ikan Selayang contends that it implemented its normal procedures to prepare the vessel's hold to carry plaintiff's zircon sand. Defendant argues that the rust found on the zircon sand was not caused by any miscarriage of the cargo or deficiency of care aboard the ship. In response to plaintiff's claims, defendant suggests several alternative scenarios as to how plaintiff's sand became contaminated. In any event, defendant states that it exercised due diligence in its transport of plaintiff's sand and that plaintiff's representative had declared the hold fit to carry the cargo. Additionally, defendant argues that plaintiff failed to give it proper notice of any harm to the cargo and did not sufficiently attempt to mitigate its damages.

### THE RECORD

Plaintiff presented six witnesses: Holly Chapell, Manager of Exotic Materials for Sogem–Afrimet; Rigoberto Gonzalez, Dock

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as United States District Judge by designation.

2. The court granted defendant's motion to dismiss all claims against Pacific Carriers PTE., LTD., and Chrisholm Trading PTE., LTD. (R. 299).

Superintendent for Dix Shipping Company; David Lapeyre, General Manager for the Brownsville Gulfside Warehouse; Robert Naegele, employee of Ewig International Marine Corporation; Dr. Brandt Rising, President and Laboratory Director of Umpire and Control Services; and Captain John Alder, President of John Alder & Company. Defendant presented two witnesses: Renée Lessard, Ship operator for Fednav LTD.; and Clinton Barrans, Claims Manager for Fednav LTD. In all, 133 exhibits were admitted into evidence at the trial.

Pursuant to agreement by counsel and F.R.C.P. Rule 32(a)(3)(E), the depositions of Gregory Dunn, Manager for Australian Laboratory Services; Cecil Martin, Shipping Manager for Consolidated Rutile Limited; Neal Stewart, Processing Manager for Consolidated Rutile Limited; Paul Vogel, employee of Australian Laboratory Services; Michael Pearson, Director of Plumley, Pearson & White; Hector Gonzalez, employee of Ewig International Marine Corporation; Kenneth Jones, Plant Manager of Elf Atochem; Anne Marie Philippaerts, employee of J. Haenecour & Co.; Zbigniew Stasiak, Chief Officer of the Ikan Selayang; and Captain Malcolm Gater, Master of the Ikan Selayang, were admitted into evidence.

## FINDINGS OF FACT

Plaintiff, a New York based buyer, seller, and trader of non-ferrous minerals and metals, had an exclusive arrangement to buy zircon sand [3] from Consolidated Rutile Limited (hereinafter "CRL"), an Australian Company, for resale in North America and Mexico. Defendant, a Canadian operator and time-chartered owner of the motor vessel Ikan Selayang, entered into a charter party with plaintiff for the vessel to transport plaintiff's cargo (Exh. 2). The cargo, in the instant case, consisted of 700 metric tons of premium grade zircon sand to be delivered from Brisbane, Australia to Brownsville, Tex-

as aboard the M/V Ikan Selayang. A charter broker company, M.I.D. Ship Marine Inc. ("MID"), was used to obtain the space aboard the ship for the carriage of the cargo. MID received and relayed all communications between defendant and the plaintiff. In the contract of carriage, defendant warranted that Hold 6 of the M/V Ikan Selayang its decks and its stanchions would be swept, cleaned, and be made suitable for the bulk shipment of plaintiff's zircon sand before the vessel was brought to Brisbane for loading.

On August 20, 1991 plaintiff purchased 700 metric tons of premium grade zircon sand from CRL for A$340.00 (Australian dollars) per metric ton F.O.B. vessel, a total of A$238,000.00 [4]. CRL operates a mill in Pinkemba, Brisbane that subjects the zircon sand to a rigorous separating process in order to meet the premium grade specifications. At the CRL mill, the zircon sand passes through several stages of electromagnetic processing to separate conductive material from nonconductive material. The zircon sand was subjected to further treatment by putting it through a vibrating screen with 2 centimeter holes and a second screen with 1 millimeter holes. After the larger material had been separated, the zircon sand was subjected to 8 high voltage electrostatic rotating rolls designed to remove the magnetic rust and iron from the non-magnetic sand. The final result of this process should result in premium grade zircon sand that contained a minimum of 66.0% zircon silicate and which has had virtually all contaminants eliminated.

The finished premium grade zircon sand is held in "product bins" at CRL's dry mill before being transported from the mill to a storage location at the Hamilton Wharf in Brisbane. The sand was thereupon loaded into tipper trucks [5] inside the dry mill by pulling the cargo beds of the trucks directly beneath the product bins inside the dry mill. The product bins themselves were fully enclosed to prevent contamination of its contents. Furthermore, the dry mill was cov-

---

**3.** Zircon sand is a highly refined mineral sand used in the manufacture of glazes for tiles and other sanitary ware.

**4.** Based upon existing exchange rates at the time of the sale, the price for the zircon sand in

United States Currency was approximately $266.56 per metric ton for a total of $186,592.

**5.** Tipper trucks have a mechanism that allows the body of the truck to be tilted so the material will flow out of the body at a certain angle.

ered by a roof to prevent any contamination while the trucks were being loaded. During the transport to the Hamilton Wharf, the trucks were fully tarped in order to avoid any form of contamination of the zircon sand, and the tarps remained on the trucks during the discharge of the load at the storage facility.

After the zircon sand was unloaded at the storage facility, it was loaded onto the ship using a series of mobile and fixed conveyor belts. Prior to the actual loading but after the sand was placed onto the conveyor belts, Australian Laboratory Services ("ALS") took samples of the zircon sand for analysis. The purpose of this analysis was to ensure that no rust or other foreign material entered the cargo beds when the trucks transported the material from the mill in Pinkemba to the Hamilton Wharf.

Defendant contends that prior to the loading of the zircon sand onto the vessel, the sand was moved around from point to point ashore in Australia by CRL and that this travel exposed the sand to rust, iron, pebbles, and dirt from various sources including other bulk cargoes, trucks, metal roofs, and conveyor belts. The court, however, finds that the evidence fails to support this conclusion. Neal Stewart, Processing Manager for CRL, testified regarding the processing of the zircon sand prior to loading onto the ship. CRL took samples of the zircon sand every two minutes on its way to the product bins inside the dry mill, and automatic samples of the final zircon sand product were tested daily by ALS. Although CRL processes Ilmenite, as well as zircon sand, which has a 33% iron content and can be magnetic, the tests of the zircon sand taken by CRL and ALS in the twelve months preceding the loading of the M/V Ikan Selayang were within contract specifications and failed to reveal any contamination. Hence, no prior history of any contamination existed with respect to the operating procedures of the laboratory.

Furthermore, the tipper trucks used to transport the zircon sand from the mill to the loading wharf were used only to transport zircon sand in order to avoid any contamination with other mineral sands or rust. Consequently, the proof in this case establishes that no rust contamination had ever been introduced to the tipper trucks and that they were clean and free from contaminants. CRL's Shipping Manager, Cecil Martin, testified that the trucks were covered at all times with tarpaulins to protect the material inside the cargo beds from being contaminated during transport. During the loading period of the zircon sand in the CRL mill, the trucks and the mill were protected by a roof above the mill. The tarpaulins contemporaneously remained on the trucks during the journey from the CRL mill to the Hamilton Wharf, and were designed to discharge the zircon sand at the wharf without removing the tarps covering the cargo beds.

Nor could the contamination come from the warehouse. The roof on the warehouse and the roof covering the conveyor belts were made of galvanized iron in order to guard against rust. Further, the mobile and fixed conveyor belts were made of rubber and did not come in contact with any metal or iron that would have contaminated the zircon sand while being transported on the conveyor belts. Therefore, the court finds that the zircon sand was not contaminated prior to loading onto the M/V Ikan Selayang.

Before the transfer of the zircon sand to the M/V Ikan Selayang, defendant and the vessel's officers prepared the vessel's No. 6 Hold for the zircon sand pursuant to defendant's "Standard Requirements" for hold cleanliness. These included the following pertinent instructions:

All loose rust scale must be removed from the hold prior to loading, with particular attention being given to the underside of the hatch covers, the coaming faces, the underdeck spaces at both ends of the hold, the undersides of the top tanks, the inner surfaces of the ship's shell plating, the "hidden flanges of the frames and the upper and lower frame brackets, the fore and aft'r bulkheads including ladder flanges and ledges, ventilator trunkings ledges and grills and tank tops.

Before the M/V Ikan Selayang reached Brisbane, Australia for the loading of the zircon sand, the ship dropped anchor in Masinloc, Philippines. In Masinloc, defendant hired shore labor to clean the vessel's hold

because No. 6 Hold was described in the Master's Report as "not so good" (Exh. K–3). About twenty shore laborers were hired to remove hard rust scale from the steel surface inside of the hold. Sledge hammers, chipping hammers, and scrapers were used only on the areas of the ship that the laborers could physically reach from the floor of the hold. Neither scaffolding nor mobile man lifts were used to reach the upper reaches of the hold. Subsequently, as testified by the Chief Mate, the upper reaches of the hold could not be hammered and scraped of hard rust scale, but instead, the upper parts of the hold were sprayed with pressurized water "just for removing loose paint and loose rust over there and the residue of any cargo if that existed" (Deposition of Zbigniew Stasiak, p. 89). It should be emphasized that the pressurized water spray was not designed for removing hard rust scale.

Apparently, defendant did not believe scaffolding was necessary to properly clean No. 6 Hold and thus, did not instruct the ship's crew to assemble scaffolding to reach the upper areas of the hold (Stasiak Deposition, pp. 85–89). After leaving the Philippines, the crew of the Ikan Selayang continued to chip and scrape excess rust and paint from inside No. 6 Hold. At no time, however, were the upper regions of the hold manually chipped or scraped.

Upon the vessel's arrival in Brisbane, CRL on behalf of plaintiff appointed Michael Pearson, an independent surveyor, to inspect the holds number 3 and 6 prior to the loading of the zircon sand. According to Pearson, he inspected both Hold number 3 and Hold number 6 within a span of approximately 10–15 minutes. His responsibilities included, among other things, inspecting the hatch coaming and drainage channels around the perimeter of the hatch opening, inspecting the outsides and insides of the hatch cover panels, descending partially down the access ladder on the forward bulkhead of one hold, and descending further down the forward bulkhead ladder to another landing and again inspect the ship's structures in the vicinity of the ladder. Hold no. 6 is 19.8 meters long and the hatch aperture is 9.6 meters long. Pearson did not bring any light into the No. 6 Hold in order to assist his inspection, despite the examination's requirement of visual inspections from distances ranging between five and thirty-five feet away. In his deposition, Pearson stated that it is possible that hard rust scale could come off the sides of the ship's hold if it was struck by a heavy object (Pearson Deposition, p. 57). He further testified that the opening and closing of hatch covers could cause prior cargo residues or rust scale to become dislodged and fall down onto the remaining cargo. After his examination, Pearson certified each of the holds to be fit for the transport of zircon sand.

Plaintiff's expert, Captain John Alder, testified that a 10–15 minute inspection of holds 3 and 6 was "extremely cursory," and that a proper inspection of the holds should have taken one hour. Captain Alder added that without the proper equipment, such as scaffolding and man lifts [6], only a spot check of certain areas could be accomplished. After observing Captain Alder in court and closely examining his testimony, the court believes him to be entirely credible and finds that the evidence suggests that the inspection performed by Mr. Pearson was wholly incomplete and unsatisfactory. From the deck to the bottom of No. 6 Hold aboard the M/V Ikan Selayang was approximately 43 feet (R. 256). It is difficult to imagine that Pearson could possibly have had adequate time to check, in any way, all areas of the two holds within 10–15 minutes, let alone examine these areas closely.

Moreover, the record further suggests the absence of proper tools and equipment for the inspection. When this is considered in conjunction with the short time in which Pearson conducted the inspection, the evidence unequivocally supports the opinion of Alder. Therefore, notwithstanding Pearson's definitive declaration of the fitness of the

6. Captain Alder testified that in some cases mobile man lifts, such as cherry pickers where men will sit in a basket, have been used to clean as well as inspect the higher up areas of the holds.

The record does not reflect whether mobile man lifts were available on the vessel or at any time during the inspection by Pearson, and he never mentioned that he used any similar devices.

holds to carry zircon sand, the court finds his opinion to be of little probative value.

Prior to the arrival of the M/V Ikan Selayang in Brownsville, Texas, the vessel stopped in Wilmington, North Carolina in order to discharge thirty-five hundred metric tons of zircon sand. To facilitate the offloading, a crane with a bucket was used to discharge the sand from the vessel's No. 6 Hold. The delivery of this shipment was uneventful, and there were no complaints regarding the condition of any of the zircon sand delivered to Wilmington.

On November 5, 1991, the M/V Ikan Selayang arrived in Brownsville, Texas. The following day on November 6, 1991 discharge of the zircon sand from No. 6 Hold commenced at 7:40 a.m. at which time Rigoberto Gonzalez, the dock superintendent for Dix Shipping Co., witnessed the hatches being open for the first time. Gonzalez testified that he noticed approximately 50 specks of what appeared to be rust less than three inches in size. Continuing, Gonzalez notified the chief mate of the rust specks, at which time the chief mate sent one of the crewmen down into the hold to pick up the specks. After the specks of rust had been picked up by one of the crewmen, Mr. Gonzalez testified that he had notified his boss of the discovery of the rust at the Brownsville dock. With respect to such alleged notification, the testimony of Gonzalez is unclear as to whether he notified Chapell of the spots he observed. Based upon the testimony of Chapell and her lack of reaction at the dock, the court finds that there was no effective communication respecting Gonzalez's observations of contamination in the zircon sand.

The unloading of the zircon sand continued throughout the day by means of a clam shell bucket on a crane which emptied the sand directly into dump trucks. Prior to its use, the clam shell bucket was fully inspected by Gonzalez who testified that he did not observe any rust, dirt or debris. Furthermore, Mr. Gonzalez inspected the seven or eight dump trucks used in the transport of the zircon sand. Gonzalez also stated that he commenced inspection of the trucks at 7:45 a.m. the day of the unloading by having the beds of the trucks lifted up so that he could visually inspect the inside of the trucks. He concluded that the dump trucks did not contain any contaminants. The zircon sand that was loaded onto the dump trucks was taken directly from the Ikan Selayang to the Brownsville Gulfside Warehouse.

Defendant contends that there was a rust mist on the outside of the clam shell buckets due to storage of the equipment outside. Specifically defendant points to a portion of Gonzalez's testimony where he stated that a red mist covered the clam shell buckets when they are about to be used early in the morning. Gonzalez also testified that the clam shell buckets contained no rust because they are constantly being used. Indeed, Gonzalez's testimony was extremely unclear, and after careful review the court believes that the fair inference which can be drawn from his testimony is that there may be some type of mist which appears on the buckets in the early morning but that there was no rust in the bucket which could have produced the large amount of particles found in the sand.

At the Brownsville Gulfside Warehouse, the zircon sand was placed onto a concrete pad which was specially laid for the receipt of zircon sand. The shipment of zircon sand was the first cargo ever to rest upon the new pad. The warehouse containing the sand was completely covered at all times. Once the entire shipment of 891 metric tons of zircon sand was placed in the Brownsville Gulfside Warehouse, there was a primary pile of sand and a secondary pile consisting of sweepings. The sweepings pile contained the last of the sand contained in the ship's hold, as well as, any sand that was dropped from the trucks or on the ground between the warehouse and the ship.

Of the 891 metric tons of zircon sand contained in the warehouse, plaintiff contends that 700 metric tons were contracted to be sold to Derivados Metal–Organicos, S.A. De C.V. ("Demosa"). Defendant counters that plaintiff did not furnish adequate evidence in support of its claim that there was a valid contract of sale entered into by plaintiff and Demosa. In resolving this factual dispute, the court finds that plaintiff has sufficiently established that it did have a contract to sell 700 metric tons of its zircon sand to Demosa.

Although the copy of the contract of sale presented to the court was unsigned, other evidence indicates that there was a valid contract of sale (Exh. 7). Initially, Chapell specifically testified that there was a contract between the parties for the terms incorporated in the unsigned copy of the document. Moreover, Chapell explained that it was within the usual practice in business dealings between plaintiff and Demosa for the buyer not to return a signed copy of the contract. Importantly, the evidence indicates that there was performance by the parties which corresponded to the contract terms. Plaintiff did send an initial shipment of sand to Demosa and although it was rejected, Demosa complained of the quality of the sand and did not refuse delivery because there was no purchase agreement. Thus, based upon the document itself, the testimony of Chapell, and proof of performance, the court concludes that plaintiff sustained its burden to prove the existence of a contract for sale of zircon sand for $342 per metric ton between plaintiff and Demosa.

One truckload of zircon sand from the Brownsville Gulfside Warehouse was bagged and sent to Demosa in November, 1991. Although the first shipment of sand was dispatched, Demosa rejected the goods because the sand had been darker and yellower than Demosa's standard and would have yielded a final product with a yellow tinge. According to Gregory Dunn, manager of ALS, the presence of rust particles in the zircon sand could account for the sand's apparent yellow tinge. Consequently, Demosa did not accept the remainder of the 700 metric tons of zircon sand and considered its contract with Sogem no longer binding.

Of the remaining 891 metric tons of zircon sand, plaintiff contracted to sell 61 metric tons to Ferro Mexicana ("Ferromex"). On February 25, 1992 approximately 21.5 metric tons of zircon sand was sent from the Brownsville Gulfside Warehouse to Ferromex. After receiving the sand, Ferromex discovered rust contamination and demanded that the rust contamination be removed before completing the delivery. Plaintiff, upon hearing of the alleged contamination, notified David Lapeyre, the warehouse manager, who inspected the pile for rust. Lapeyre randomly drew samples of the sand with his hand and discovered pieces of rust in the large pile of zircon sand. On April 2, 1992 representatives of Sogem and Ferromex held a meeting at the warehouse in which 1,000 pounds of the zircon sand was poured over a magnet. The magnet removed approximately one-quarter cup of iron pieces. Hopeful that this process would remove the rust from the sand, on April 7, 1992 Lapeyre, at the direction of plaintiff, used a triple grid magnet to attempt to remove the rust scale from the zircon sand.

A hopper was constructed which would direct the flow of the sand over three layers of grate magnets. The zircon sand was poured over the magnets and rust contaminate was caught by the magnets. Over 100 pounds of rust scale was removed from the sand by this method. Despite the fact that some of the rust was being filtered out of the pile after the sand was run past the three magnets, rust contaminate still remained mixed with the filtered sand. The entire process was necessarily stopped after every 6,000 pounds of sand was put through the hopper so that the rust could be cleaned off the magnets. On April 9, 1992 the warehouse notified plaintiff that the magnetic hopper was successful in removing much of the rust but that there was still a significant amount of contamination contained within the sand.

On April 21, 1992 a second truckload of zircon sand was sent to Ferromex which had also been found to have contained rust scale. Subsequently, plaintiff sought the advice of CRL on suggestions how to remove the contamination from the sand. CRL suggested passing the zircon sand through a screen either 0.600 millimeter or 0.850 millimeter woven wire and then poured over magnets. Although this information was conveyed to Brownsville Gulfside Warehouse, Lapeyre testified that, at the time, no facility could be located which could provide the type of screen sufficient to initiate this process. Moreover, Dr. Rising, who specializes in geochemistry, testified that it is doubtful that CRL's suggested process would have returned the zircon sand to it premium condi-

tion. Accordingly, unable to sell the zircon sand under its contracts, plaintiff was compelled to sell the sand for salvage. The sale of the salvaged zircon sand amounted to $15,-355.

During his inspection of plaintiff's cargo, Hector Gonzalez took samples of the zircon sand. The samples, in which he observed rust particles, were delivered to plaintiff's counsel through the Ewig Company and subsequently sent to Dr. Rising at Umpire & Control Services. Dr. Rising's analysis of the samples found contamination of the sand with rust scale, rust dust, and rust scale coated with red primer paint (Exh. 70). During the return of the samples by Dr. Rising, one of the five samples was lost. No explanation was offered to account for the missing sample. Despite the loss of one sample, the court finds that the evidence sufficiently supports plaintiff's contention that the returned samples were, in fact, zircon sand taken from the Brownsville warehouse.

By written correspondence dated April 16, 1992, plaintiff notified defendant of the zircon sand contamination. The notification of defendant was addressed to plaintiff "C/O M.I.D.–Ship Marine Inc.," the broker used by plaintiff to arrange the transport of this cargo. Plaintiff had previously always communicated with ship owners through a broker and specifically, in this case, had only contacted defendant through M.I.D.–Ship Marine Inc.

## CONCLUSIONS OF LAW [7]

This case involves claims by the owner of premium grade zircon sand against an ocean carrier arising from an alleged breach of contract of carriage. The matter, therefore, falls within the court's admiralty jurisdiction. *Allied Chemical v. Companhia de Navegacao,* 775 F.2d 476, 481 (2d Cir.1985), *cert.*

*denied,* 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986). The private contract of carriage is the charter party which incorporates the United States Carriage of Goods by Sea Act ("COGSA"). 46 U.S.C.App. § 1300 *et seq.; Associated Metals & Minerals Corp. v. S.S. Jasmine,* 983 F.2d 410, 413 (2d Cir. 1993). Consequently, COGSA is the governing law in this matter.

■ Plaintiff insists that the defendants are liable for the loss of cargo under COGSA. In order for a party to enforce its rights under COGSA, "litigants must engage in the ping-pong game of burden shifting mandated by sections 1303 and 1304 of the Act." *Tubacex Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995). Initially, the burden falls on the plaintiff shipper, who must establish a *prima facie* case of loss. This burden is satisfied if the shipper can demonstrate delivery of the cargo in good condition to the carrier *and* either the arrival of less cargo than was loaded or delivery of the goods in damaged condition. *See* 46 U.S.C.App. §§ 1303(3) and 1304; *see also, Thyssen, Inc. v. S/S Eurounity,* 21 F.3d 533, 538 (2d Cir.1994); *New York Marine & Gen. Insurance Co. v. S/S Ming Prosperity,* 920 F.Supp. 416, 422 (S.D.N.Y. 1996). It is only after a plaintiff establishes a *prima facie* case, does the burden then shift, requiring the carrier to establish that any loss falls within one of COGSA's exceptions. *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982); *Judy–Philippine Inc. v. S/S Verazano Bridge,* 781 F.Supp. 253, 258 (S.D.N.Y.1991).

### A.

■ As a threshold matter, the court must address the issue of notice. Defendant contends that the failure of plaintiff to give notice [8] until five months after the discharge

---

**7.** Any conclusion contained within this section that also constitutes a factual determination should be deemed a finding of fact.

**8.** The court rejects defendant's argument that plaintiff's decision to notify it through the broker M.I.D.–Ship Marine was improper. While it is true that plaintiff could have notified defendant directly, its ordinary course of business was to contact and receive messages from defendant through M.I.D.–Ship Marine, Inc. In correspon-

dences dated April 16, 1992, plaintiff sent notification of the contamination of the cargo addressed to defendant c/o M.I.D.–Ship Marine Inc. The overwhelming evidence is that the parties communicated through the broker. For example, the invoices were sent to plaintiff by defendant through the broker, as were notices required under the Charter Party, and indeed, even the voyage instructions provided that the ship was to send required notices through M.I.D.–

of the sand defeats plaintiff's claim by operation of statute. Section 3(6) of the COGSA provides in relevant part:

> Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent the notice must be given within three days of the delivery.

46 U.S.C.App. § 1303(6). In this case the failure of the plaintiff to give notice to defendants within three days creates a presumption in favor of defendants that the cargo was delivered in good condition. Absent any contrary evidence, the presumption of the notice provision would defeat plaintiff's claim altogether. *See e.g., M.W. Zack Metal Co. v. the S.S. Birmingham City,* 291 F.2d 451, 453 (2d Cir.1961); *Leather's Best Intern., Inc. v. MV Lloyd Sergipe,* 760 F.Supp. 301, 309–10 (S.D.N.Y.1991). Notwithstanding the foregoing, "[a]ny such presumption of good delivery falls, however, once the plaintiff adduces any credible evidence tending to show that the cargo was damaged prior to delivery." *Ferrostaal Corp. v. M.V. Singa Wilguard,* 838 F.Supp. 757, 767 (S.D.N.Y.1993); *see also, Pacific Employers Ins. Co. v. M/V Gloria,* 767 F.2d 229, 238 (5th Cir.1985); *C. Itoh & Co. v. Hellenic Lines, Ltd.,* 470 F.Supp. 594, 597 (S.D.N.Y.1979). As will be discussed more fully below, the record does, indeed, show that plaintiff has produced evidence that the rust contamination took place while the zircon sand was in defendants' custody. The plaintiff has, therefore, put forth credible evidence which rebuts the presumption afforded to defendant as a result of receiving late notice. Accordingly, having found that the late notice does not bar plaintiff's case, the court will address the substantive merit of plaintiff's claim.

Ship Marine. Considering the undeniable fact that plaintiff and defendant had established a course of business which required information to

**B.**

Merely overcoming the presumption of good delivery does not mean that plaintiff prevails on the ultimate issue. As previously stated, plaintiff is required to establish that it delivered the cargo to defendant in good condition but at outturn the cargo was damaged. Plaintiff argues that defendant received the zircon sand in good condition but delivered the sand in damaged condition due to contamination by rust. To establish a *prima facie* case, the shipper must adduce evidence that, standing alone, establishes both prongs of the claim. *R.B.K. Argentina v. M/V Dr. Juan B. Alberdi,* 935 F.Supp. 358, 368 (S.D.N.Y.1996). In this case, the court finds that the plaintiff has established a *prima facie* case against the defendants.

The first part of the test requires that plaintiff establish that it delivered the cargo in good condition. Here, the evidence clearly illustrates that the sand was not contaminated by rust when it was received by defendant. Initially, there is the unrebutted testimony of plaintiff's Australian witnesses that all of the sand loaded into No. 6 Hold was in good condition. The record demonstrates the meticulous processing to which the sand was subjected. Indeed, it appears that every precaution was taken by the CRL mill to ensure that its sand was not infiltrated with impurities. Moreover, there is the laboratory evidence supporting plaintiff's claim that it delivered the sand in good condition. Gregory Dunn testified that random samples of the sand were taken as it was moved to the ship and these samples were analyzed at the ALS laboratory and no rust contamination was found.

Defendant concludes that because the samples for the first 700 metric tons of sand loaded into the No. 6 Hold were discarded, the is no reliable measure of the condition of the sand that was ultimately delivered to Brownsville. The court does not agree with defendant's conclusion. Initially, the Australian witnesses testified that the entire shipment of sand was in good order. Moreover,

be conveyed through the broker, it is entirely reasonable that plaintiff would notify defendant in this same manner.

even assuming a defect in the sampling of the sand ultimately bound for Texas, defendants' argument ignores the fact that before any sand was loaded the No. 6 Hold, more than 5000 tons of rutile sand was loaded into No. 3 hold, using the same conveyorbelt. Yet, there was no rust contamination of the rutile sand. Surely, if the conveyor belt was responsible for contaminating the zircon sand, it would have had the same effect on the previous load of sand. Finally, there was abundant evidence that many appropriate precautions were taken to ensure that the loading conveyors were maintained rust-free and that contaminants from prior cargo. As Judge Friendly aptly noted, one method of demonstrating good condition of goods at delivery "would be to show that the goods were prepared and packaged in accordance with proper procedures and were carried to the ship under conditions that should have prevented any damage to the contents en route." *Caemint Food v. Lloyd Brasileiro,* 647 F.2d 347, 354 n. 6 (2d Cir.1981). Accordingly, even if the court did not consider the chemical analysis of the samples, plaintiff has clearly sustained its burden by establishing the careful procedures employed in loading the sand and the demonstrating that none of the cargo, other than the zircon sand unloaded in Texas, suffered any rust contamination. Therefore, the plaintiff has established the first prong of its *prima facie* case.

■ The court likewise finds that plaintiff has sufficiently sustained it burden of demonstrating that the cargo was damaged at outturn. There is no question that defendant was aware of the refined nature of plaintiff's sand. Defendant's own "standard requirements" regarding zircon sand demonstrate its knowledge of the importance of thorough cleaning. The requirements state:

> *ALL* loose rust scale must be removed from the hold prior to loading, with particular attention being given to the underside of the hatch covers, the coaming faces, the underdeck spaces at both ends of the hold, the undersides of the topside tanks, the

inner surfaces of the ships shell plating, the "hidden" flanges of the frames and the upper and lower frame bracket, the fore and aft'r bulkheads including ladder flanges and ledges, ventilator trunkings ledges and grills and the tank tops.

Exh. J–1.

Moreover, it is also undisputed that at the time the revised stowage plan was presented to defendant the condition of No. 6 hold of the vessel was stated in the Master's Report to be "Not So Good" (Exh. K–3). The degree of rust and rust scale present in the hold was so problematic that a shore crew was retained to chip and scrape No. 6 Hold in preparation for the zircon sand. Despite, however, the presence of "heavy rust," as described by the vessel's Chief Mate, the shore crew physically chipped and scraped rust only to those areas which they could reach. The only attempt to clean the upper portions of No. 6 Hold was to use high pressure water spray, which according to the Chief Mate, was not designed to remove hard scale rust but only used to remove "loose paint and loose rust" and could not remove all of the rust.

Coupled with the showing of severe rust in No. 6 Hold, was the credible testimony of plaintiff's expert Alder who testified that there were many places in the upper areas of the hold which were likely to contain rust and may have even been in worse condition than the lower area. In addition, Alder explained that as the hold became less full, the increased vibrations of the ship would act to dislodge layers of rust scale. In point of fact, Pearson provides additional explanations that hard scale rust could have become dislodged if a grab had banged into the wall of the hold. Certainly, as the sand was unloaded at Wilmington, it is reasonable to conclude that the grab, used to offload the cargo may have struck some area of the hold, thereby causing rust to fall upon the remaining sand which was delivered to Texas. Finally, the fact that analysis[9] of the rust found a coating of red primer paint frequent-

---

9. The court finds that the deposition testimony of H. Gonzalez and the live testimony of Dr. Rising demonstrated by the fair preponderance of the evidence that the samples tested by Dr. Rising were, in fact, samples of plaintiff's zircon sand

taken from Texas. Fed.R.Evid. 901(a); *see also, United States v. Grant,* 967 F.2d 81, 82 (2d Cir. 1992), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

ly used in preparing the surfaces of steel ships for painting, creates another basis to determine that the rust originated in the No. 6 Hold. The short of the matter is that all of this evidence demonstrates the damage occurred while it was in the hold of defendant's vessel, and therefore the plaintiff has established its prima facie case.. *See Arkwright Mut. Ins. Co. v. M.V. Oriental Fortune,* 745 F.Supp. 920, 923 (S.D.N.Y.1990); *A.J. Cunningham Packing Corp. v. M/V Australian Exporter,* 719 F.Supp. 258, 259 (S.D.N.Y. 1989).

Defendant asserts that there were "numerous opportunities for the zircon sand to have picked up bits of rust during the discharge" in an attempt to cast doubt upon plaintiff's allegations as to what occurred. Specifically, defendant hypothesizes the rust may have come from a clamshell bucket used to discharge the zircon sand in Texas, that the front end loader may have contaminated the sand, that the rust came from either steel coils or a prior cargo of bulk sodium cargo which was stored at the Brownsville warehouse, and finally, defendant maintains that the sweepings of the zircon sand could account for the rust. The court finds that none of these assertions rise beyond mere possibility and are generally refuted by the evidence presented in this case.

Initially, as previously noted the testimony of Gonzalez was hardly clear as to whether there was rust on the clamshell bucket. No evidence was ever presented that definitively illustrated that rust existed on the clamshell bucket and if so, how extensively was the bucket rusted. Moreover, even assuming that some rust was present on the bucket, the logical conclusion to defendant's argument, that over 100 pounds of rust chips were the result of the clamshell bucket strains credulity to its breaking point.

Nor does the evidence suggest that the trucks were responsible for the rust. Plaintiff provided evidence of the careful inspection and cleaning of the trucks prior to the discharge of the sand. The deposition testimony of the vessel's Chief Officer and the

trial testimony of Adler each point to the far more likely conclusion that the No. 6 Hold was responsible for the rust contamination.

It is even less likely that the rust was the result of any contamination in the warehouse. The testimony of Lapeyre is uncontested with respect to the special precautions taken in making the warehouse ready for plaintiff's sand. In particular, was the fact that the sodium nitrate cargo was not even present at the time when the zircon sand was brought to the warehouse and that an entirely new concrete pad was created so that the sand would not be contaminated by any residue left on the previous floor of the warehouse. Plaintiff's sand was the first bulk cargo to be laid upon the new pad, hence, any previous rust residue that existed on the original floor of the warehouse could not have affected the sand.

Defendant's conjecture that the steel coils were somehow responsible for the approximately 100 pounds of rust is unsupported by the evidence. The coils were not present when the zircon sand shipment arrived. More, no evidence was introduced suggesting that the steel coils became rusty. In addition, the concrete pad would have prevented any prior contamination in the warehouse from affecting the sand, and the two piles of zircon sand were covered with plastic sheets at the Warehouse. Consequently, defendant's theory regarding the coils obviously does not diminish plaintiff's proof establishing its prima facie case.

Finally, defendant seeks to imply that perhaps some of the sweepings were co-mingled with the primary pile and thereby accounting for the rust contamination. Defendant rests this assertion upon the shaky foundation of alleged inconsistent testimony of Gonzalez and Lapeyre. While Gonzalez states that two trucks carried the sweepings, Lapeyre indicated that there was only one. Defendant's entire argument rests on the proposition that Lapeyre was incorrect and there is a missing load of sweepings which defendant contends may have been dumped on the primary pile [10]. The court does not find the

---

**10.** It is noteworthy that defendant, in its post-trial brief does not provide a citation to support

its claim that "Mr. Lapeyre thought that there

testimony to warrant such a conclusion. Repeatedly throughout his testimony, Lapeyre reminded the court that the events to which he was testifying occurred nearly five years ago and that his recollection was not perfect. Moreover, when he spoke about one truckload of sweepings, Lapeyre's answer was not in response to a question asking how many trucks carried the sweepings. Essentially, defendant is attempting to take Lapeyre's testimony out of the context in which it was given. Considering Lapeyre's statements regarding his difficulty in recalling minor details due to lapse of time and the fact that he was never specifically asked how many trucks carried the sweepings, the court is not persuaded that any true contradiction exists.

In any case, defendant offers nothing more than speculation that there was a commingling of the primary pile and the sweepings. Further, even if the sweepings pile held the 100 pounds of rust which was discovered in the sand, the sweepings came out of the same hold as did the primary pile. Therefore, even accepting defendant's theory of what happened, that version does not discount the likelihood that the rust contained in the sweepings originated from No. 6 Hold. Each of the scenarios put forth by defendant rest upon "surmise and conjecture" which may not be substituted for proof. *See Minemet, Inc. v. M.V. Mormacdraco,* 536 F.Supp. 769, 775 (S.D.N.Y.), *aff'd,* 714 F.2d 115 (2d Cir.1982). Upon examination, the fair preponderance of credible evidence supports plaintiff's allegation that it delivered the cargo to defendant in good condition and received damaged goods at outturn. Accordingly, the court finds that plaintiff has sustained its burden of proving its prima facie case. *Goya Foods, Inc. v. S/S Italica,* 561 F.Supp. 1077, 1083 (S.D.N.Y.), *aff'd,* 742 F.2d 1434 (2d Cir.1983).

## C.

■ The duty imposed by COGSA upon a shipowner is to exercise due diligence in providing a seaworthy ship. 46 U.S.C.App. § 1303(1)(a). "Thus, even if unseaworthiness caused the loss, the shipowner can still be exonerated from liability under COGSA if it establishes that it exercised due diligence in attempting to make the ship seaworthy." *Complaint of Tecomar S.A.,* 765 F.Supp. 1150, 1179 (S.D.N.Y.1991). Defendant argues that the actions it undertook to prepare No. 6 Hold demonstrate that it exercised due diligence, employed all reasonable precautions, and should therefore not be held liable[11]. After careful review of the entire record, the court cannot accept defendant's argument.

■ There is no question that defendant was experienced at handling mineral sands. Indeed, the record plainly demonstrates that defendant's own "standard requirements" for the carriage of mineral sands stated, respecting zircon sand, that "any form of contamination is harmful" Exh. J–1. Likewise, defendant, after being informed that the hold was "not so good," hired a shore crew to come aboard the ship to chip and scrape away the hard scale rust which had accumulated on the hold. The problem with defendant's actions stem from the fact that in its guidelines for handling mineral sands, such as plaintiff's cargo, defendant states that "all" rust must be removed from the hold. As noted, defendant did hire a shore crew to eliminate the rust in the hold, but erected no scaffolding to permit the clearing of rust on the upper level of rust. While there was a pressurized water spray applied to the upper areas of the hold, the Chief Mate himself admitted that the water spray was designed to adequately dislodge already loose rust and paint chips, but not to scrape hard scale rust. Accordingly, the hard scale rust which would have been located in the upper portion was left virtually untreated in the hold. Since this rust could be knocked loose by the increased vibrations

was on truckload of sweepings." Defendant's Memorandum of law, p. 13–14.

11. Defendant's reliance on the survey conducted by Pearson is misplaced. As previously discussed, the court accepts the expert opinion of Alder who opined that the examination of the Number 3 and 6 holds could not have been complete. Pearson simply did not spend enough time to be able to adequately make a determination of the fitness of the hold. Accordingly, his conclusion that the hold was fit for zircon sand and that the rust contaminate did not originate in the hold if of no persuasive value.

of a nearly empty hold during an ocean voyage, heavy machinery which may be utilized to unload the sand, or by the opening and closing of the hatch, defendant failed in its duty of due diligence under COGSA. *See Siderius v. M.V. Amilla*, 880 F.2d 662, 666 (2d Cir.1989). Defendant could have prevented the risk of rust falling into plaintiff's cargo but did not and therefore cannot be said to have exercised due diligence.

### D.

■■■ Defendant argues that even if the court finds that defendant's vessel was not fit for receipt of the cargo, the act of plaintiff's inspector certifying the fitness of the hold establishes an affirmative defense which exonerates defendant. Defendant first points to the charter party which provides that the owners are to have the charterer's representative pass the holds as clean or ready. Since plaintiff's representatives did judge No. 6 Hold to be fit for the zircon sand, defendant asserts the applicability of the section of COGSA providing "neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from ... [any] act or omission of the shipper or owner of the goods, his agent or representative" 46 U.S.C.App. § 1304(2)(i). Because plaintiff's inspector certified the hold as fit to store plaintiff's zircon sand, defendant maintains that such certification was an "act or omission of the shipper" precluding a finding of liability on defendant. The court, however, does not accept defendant's claim.

Section 1303(1) of COGSA provides:

The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation.

46 U.S.C.App. § 1303(1). It has long been recognized that stowage falls within the scope of a carrier's warranty of seaworthiness. *Nuzzo v. Rederi, A/S Wallenco*, 304 F.2d 506, 508 (2d Cir.1962); *Blommer Choco-*late Co. v. Nosira Sharon Ltd., 776 F.Supp. 760, 776 (S.D.N.Y.1991), aff'd, 963 F.2d 1522 (2d Cir.1992). In a situation similar to the case at bar, the court found that rust scale which caused damage to stowed cargo constituted a breach of the warranty of seaworthiness. *GTS Industries S.A. v. S/S Havtjeld*, 887 F.Supp. 531, 537 (S.D.N.Y.1994), aff'd, 68 F.3d 1531, 1535–36 (2d Cir.1995). The plain language of COGSA demonstrates that the Charter Party may not lessen any obligations imposed upon the carrier. Specifically, the law states:

Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties or obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect.

46 U.S.C.App. § 1303(8). The law of the Second Circuit interpreting this provision is equally unambiguous, COGSA does not permit the carrier to divest itself of the duty to insure the proper stowage of the cargo. *Associated Metals & Minerals Corp. v. M/V Arktis Sky*, 978 F.2d 47, 50 (2d Cir.1992); *Nichimen Co. v. M.V. Farland*, 462 F.2d 319, 330 (2d Cir.1972). No matter what provisions existed within the Charter Party, it was defendant's responsibility alone to maintain the No. 6 hold, in an manner fit to stow plaintiff's zircon sand.

Defendant offers a unique argument [12] as to why the court should depart from the explicit holding of the Second Circuit. In its reading of a recent decision by the Supreme Court, defendant maintains that the Supreme Court has questioned the concept of non-delegable duties arising under Section 1303 of COGSA as expressed by the Second Circuit, in light of the statutorily expressed exception to carrier liability as set forth in Section 1304(2)(i). *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, — U.S. —, —, 115 S.Ct. 2322, 2329, 132 L.Ed.2d 462 (1995).

---

**12.** Defendant also seeks to rely upon the reasoning articulated in a Note published in the Tulane Maritime Law Journal. In light of the Second Circuit's established rulings on this issue, the court finds the submission of this publication to be unpersuasive.

After examining the *Sky Reefer* decision, the court finds that defendant has misapplied that case. First, as defendant candidly admits, the entire discussion of the matter is merely *dicta*, and thus, at best, may only be used persuasively. Secondly, it is clear that when acknowledging the differing interpretations of COGSA, the Supreme Court was merely laying out the respective arguments set forth by the petitioner and respondent in that case. Indeed, in the very next paragraph, the Court stated that petitioner's claim regarding non-delegable duties was "premature." *Id.* In light of such language, the only reasonable reading of *Sky Reefer* requires the ultimate conclusion that the Court chose not to pass judgment, even in *dicta*, upon the Second Circuit's established view. Defendant's argument must therefore be rejected.

### E.

Having found that the plaintiff has established its burden and that defendant has failed to set forth any valid defense, the court now turns to the issue of damages. Defendant makes two claims with respect to the proper calculation of damages. First, defendant argues that the plaintiff has failed to submit sufficient evidence of its contract with Demosa. Second, defendant maintains that plaintiff did not adequately mitigate its damages. The court finds each of these claims to be without merit.

■ The parties are not in dispute as to how damages are to be properly calculated under the law. It is well settled that "the general measure of damages is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value of the goods in the condition in which they actually did arrive." *Texport Oil Co. v. M/V Amolyntos*, 11 F.3d 361, 365 (2d Cir. 1993); *Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115, 118 (2d Cir.1987); *Valerina Fashions v. Hellman Intern. Forwarders*, 897 F.Supp. 138, 140 (S.D.N.Y.

1995). The parties agree that in a case where a contract exists, the proper measure of a plaintiff's damage is the price plaintiff was to receive under the contract minus the amount of money plaintiff received by selling the damaged goods. *Id.* at 365; *see also, Pacol (Canada) Ltd. v. M/V Minerva*, 523 F.Supp. 579, 582–83 (S.D.N.Y.1981).

■ Here, the court has determined that there was sufficient evidence to find that there was two contracts, one between plaintiff and Demosa and one between plaintiff and Ferromex. Of course an actual contract for resale is not even required for the plaintiff to sustain its burden of proving lost profits; rather, the aggrieved party "need only proffer proof tending to show its loss." *Valerina Fashions*, 897 F.Supp. at 141; *see also, Goldenberg v. World Wide Shippers & Movers*, 236 F.2d 198, 202 (7th Cir.1956) (in order to properly establish lost profits, "no greater degree of certainty of proof is required than for any other fact essential to be established in a civil action"). Therefore, even if the court were to find that the proof of contract between plaintiff and Demosa was lacking, there is still sufficient evidence based on the previously signed contract that the market price for plaintiff's zircon sand is what plaintiff claims. In any event, the expected return upon the contract with Demosa for 700 metric tons of zircon sand was $239,400 less the salvage proceeds of $12,950 for a total of $226,450. With respect to the 61 metric tons of zircon sand rejected by Ferromex, the expected return on the contract constituted a total of $5,737.27. Finally, the measure of damage for the additional 130 metric tons of zircon sand, for which there was no sale contract, should properly be calculated from its FOB purchase value plus freight charges minus any proceeds from salvage. Here the cost of the additional zircon sand carried from Willimington and retained in the Brownsville Gulfside Warehouse including the freight[13] less salvage proceeds of $2,405 amounts to $37,974.22. Upon the complete calculation, the total measure of damages sustained by plaintiff is

---

13. Defendant contends that the freight costs to plaintiff was $34.50 per ton. However, according to the Charter Party, Clause 61, the ocean freight rate from delivery to Wilmington was

$34.50. The cost of ocean freight for delivery to Brownsville Texas, however, was $39.75 (Exh. 2, p. 4). Thus, the court finds plaintiff's calculation as to the cost of ocean freight to be correct.

$270,161.49. Accordingly, defendant is liable to plaintiff for this amount. *See Valerina Fashions*, 897 F.Supp. at 140 (under COGSA damage calculations are designed to return to plaintiff what was actually lost).

 Defendant also maintains that plaintiff failed to properly mitigate its damages. Specifically, defendant points to plaintiff's rejection of CRL's suggestion that the sand be filtered through a .6 millimeter screen and then run through a series of magnets in order to attempt the removal of additional rust. While the plaintiff is always under a duty to reasonably mitigate the damages it sustains, the burden to show failure to mitigate lies with the defendant. *Emmco Ins. Co. v. Wallenius Caribbean Line, S.A.*, 492 F.2d 508, 514 (5th Cir.1974); *C. Itoh & Co. (America) v. M/V Hans Leonhardt*, 719 F.Supp. 479, 510 (E.D.La.1989) (*citing Emmco*); *C. Itoh & Co. Etc. v. Hellenic Lines, Ltd.*, 470 F.Supp. 594, 599 (S.D.N.Y. 1979) (*citing Emmco*). Here, defendant has failed both in demonstrating that the measures taken by plaintiff did not constitute a reasonable effort and in showing the portion of the loss caused by plaintiff's failure to take additional steps. *C. Itoh & Co. (America) v. M/V Hans Leonhardt*, 719 F.Supp. at 510.

It is undisputed that when plaintiff discovered the fact that its zircon sand was contaminated with rust, measures were taken to rectify the situation. For several days, the zircon sand was passed through three separate magnets but significant rust still remained in the sand. Clearly, plaintiff took action to eradicate the problem. Moreover, defendant presents no evidence to suggest that the screen would have reduced the rust content in the zircon sand to an acceptable level. It is important to note the very detailed processing the sand undergoes when it is manufactured. Included in the process is the use of eight electrostatic separators spinning at 350 rpm and charged with 25,000 volts of electricity in an effort to remove conductive contaminates such as iron. It is difficult to imagine that filtering the zircon

sand through a screen onto magnets would significantly reduce the levels of rust contained in the sand anymore than Lapeyre's previous attempts.

Additionally, at the time when CRL suggested the use of the screen and magnets, plaintiff's representative could not locate the type of screen that was needed[14]. Finally, Dr. Rising stated that it was not possible to guarantee that this method would filter out all of the contaminants. Dr. Rising testified that the only method he thought "would probably work" to clean the sand to an acceptable level would be a chemical wash (R. 214). Because, of the amount of sand involved in this case, the time it would take to employ such a measure, and the expense plaintiff would incur in order to achieve the desired results, a chemical wash was not feasible.

In short, defendant has not established any evidence tending to show that plaintiff failed to take reasonable steps to mitigate the damage to the sand. More, defendant has not been able to demonstrate that the screen method it urges would have had any greater effect than the method employed. Lastly, the only evidence presented regarding other methods available to plaintiff, supports plaintiff's view that use of the screen would have most likely been futile. Thus, the court finds that defendant has not shown that the methods used by plaintiff were insufficient or that defendant's proposed method of mitigation would have substantially improved the zircon sand.

 Finally, plaintiff seeks prejudgment interest and costs in connection with the prosecution of this case. With respect to interest, plaintiff proposes that the rate should be based upon the average yield of a six-month Treasury Bill and run from the date of delivery of the damaged cargo. It is well settled that "the allowance of interest is the general rule, and disallowance is supportable only in the face of exceptional circumstances." *Bloomer Chocolate*, 776 F.Supp. at 779. Notwithstanding, that general rule, the

---

**14.** The fact that, well after the fact, defendant was able to locate a screen manufacturer is of no moment. The court has no reason to doubt that plaintiff and its agent engaged in a reasonably diligent search for the screen. At the time, plaintiff was still hoping to sell its sand under the contract and would therefore have every reason want the sale to proceed.

award of interest still rests within the sound discretion of the court and may be disallowed "where peculiar circumstances would make such an award inequitable." *Reeled Tubing, Inc. v. M/V Chad G,* 794 F.2d 1026, 1028 (5th Cir.1986). The court finds circumstances within this case to render any award of pre-judgment interest inequitable.

■ The record is replete with instances of delay occasioned by plaintiff. Initially, while it does not impact on plaintiff's ability to recover its actual losses, plaintiff did not notify defendant of any damage until five months after discharge. Moreover, plaintiff did not file this action until nearly two years after the initial discharge. Throughout the course of the trial plaintiff, while never acting improperly, often allowed long delays before documents were produced to defendant. Considering the circumstances, it would be manifestly unjust to allow plaintiff to collect interest for periods of elapsed time considering that many significant delays were occasioned solely by plaintiff's actions. Plaintiff should not be permitted to profit from lapses of times it predominately caused. Accordingly, plaintiff's request for interest and costs is denied.

## CONCLUSION

The court finds defendant to be liable to plaintiff for the damage sustained to plaintiff's zircon mineral sand. In accordance with this opinion, plaintiff shall recover $270,-161.49 in compensatory damages. Plaintiff's request for pre-judgment interest is hereby denied. Each side shall bear its own costs.

The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**