**WESTPORT PETROLEUM, INC., Plaintiff,**

v.

**THE M/T OSHIMA SPIRIT, her engines, tackle, apparel, etc., in rem, and VSSI Pacific, Inc. and Palm Shipping, Inc., in personam, Defendants.**

**No. 96 CIV. 2321 (JES).**

United States District Court, S.D. New York.

Sept. 5, 2000.

**428**

Kennedy, Lillis, Schmidt & English, New York City, Thomas C. Murphy, of counsel, for Plaintiffs.

Chicanowicz, Callan, Keane, Vengrow & Textor, LLP, New York City, James Textor, Jin Y. Hwang, of counsel, for Defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Westport Petroleum, Inc. ("plaintiff") brings the above-captioned action against defendants VSSI Pacific, Inc. ("VSSI") and Palm Shipping, Inc. ("Palm" and collectively, "defendants"), owners and operators of the M/V OSHIMA SPIRIT ("the Oshima Spirit"), alleging breach of a voyage charter party contract pursuant to which defendants would transport fuel oil in bulk from Los Angeles to Taiwan. Plaintiff alleges that it delivered the fuel oil to defendants for transport in good order and that leakage while the vessel was in transport increased the fuel oil's sediment and water content ("S & W") beyond the 0.5 percent allowed by a contract for delivery with the Chinese Petroleum Company of Taiwan ("CPC"). Plaintiff contends that by virtue of defendants' failure to deliver oil that met the fuel contract's specifications, they incurred contractual penalties and demurrage and reconditioning costs in the amount of $374,953.02 that are properly payable by defendants. Defendants argue that the fuel oil was delivered to CPC on specification and, alternatively, that any damages claimed by plaintiff have not been substantiated.

A four-day bench trial was held, and both parties filed post-trial memoranda of law. Upon considering all the evidence presented, as well as the arguments made by the parties' counsel at trial, in post-trial argument, and in their papers filed with the Court, the Court, for the reasons set forth below, finds that defendants delivered the fuel oil at issue on-specification for S & W and that, in any event, plaintiff has failed to substantiate any damages that are properly payable by defendants. Accordingly, this action is hereby dismissed without costs to either party.

## BACKGROUND

Pursuant to a contract entered into on March 27, 1995 ("the Vitol contract"), plaintiff agreed to sell approximately 76,-000 metric tons of 1.0 percent sulfur fuel oil to Vitol S.A., Inc. ("Vitol") which was to be delivered in two lots to ports in Kaohsiung, Taiwan between April 2, 1995 and

April 6, 1995. *See* Joint Pre–Trial Order dated May 18, 1999 ("JPTO") at ¶¶ 5(1,2). Pursuant to the Vitol contract and a joint venture agreement between Vitol and plaintiff ("the Joint Venture"), Vitol was to sell the fuel oil under the Vitol contract directly to CPC, and such oil was to meet CPC's quality specifications including a maximum S & W rate of 0.5 percent. *See id.* at ¶¶ 5(3–7). Accordingly, on or about February 14, 1995, plaintiff, as Charterer, and Defendant Palm, as Disponent Owner of the Oshima Spirit, entered into a "Mobilvoy 80"-form Charter Party ("the Charter Party"), pursuant to which the Oshima Spirit would carry the oil exchanged under the Vitol Contract and the Joint Venture to Taiwan. *See id.* at ¶¶ 5(10, 20).

The Charter Party provided, *inter alia*, that the bill of lading would be subject to the provisions of the Carriage of Goods by Sea Act of the United States, 46 U.S.C.App. § 1300, *et. seq.* ("COGSA"), and that defendant warranted

> at the commencement of loading ... [that the Oshima Spirit's] hull, machinery, boilers, tanks and equipment ... shall be in good working order and in every way seaworthy and fit for the carriage of the cargo ... so far as the foregoing conditions can be obtained by the exercise of due diligence and that she shall be so maintained throughout her service thereunder.

*Id.* at ¶ 5(12). Further, the Charter Party provided that

> [t]he vessel shall not be responsible for any admixture, leakage, contamination or deterioration in quality of the cargo

unless [such circumstance] results from (i) unseaworthiness existing at the time of loading or the inception of the voyage which was discoverable by the exercise of due diligence, or (ii) error or fault of the servants of the Owner in loading, care or discharge of the cargo.

*Id.* at ¶ 5(13).[1]

Between March 7, 1995 and March 13, 1995, approximately 73,433 metric tons of oil cargo was loaded onboard the Oshima Spirit at the Port of Los Angeles. *See id.* at ¶ 5(24). The cargo was comprised of several different parcels of oil products from four different sources. Under the CPC contract, cargoes furnished to CPC could be blends of different oil products, provided that at delivery the cargo was a homogenous mixture conforming to CPC contract specifications. *See id.* at ¶ 5(74).

The first cargo loaded onto the Oshima Spirit was located at the Texaco terminal at Los Angeles, a cargo that contained approximately 6,782 metric tons of high-cycle gas oil. *See id.* at ¶¶ 5(27–28). This cargo was loaded into vessel tank 4C, and tests after loading indicated that this tank had a S & W of 0.05 percent and no free water. *See id.* at ¶¶ 5(29–31).[2] The second source of oil loaded aboard the vessel was from Southern California Edison ("the SCE Parcels"). Such cargo was originally in two separate parcels of 5,059 metric tons of light oil with an S & W content of 0.05 percent and 12,562 metric tons of fuel oil with an S & W content of 0.50 percent. *See id.* ¶¶ (32, 34–35). Both were placed in ten tanks aboard the vessel, but neither of the SCE parcels were placed in tank 4C.

---

1. The Charter party also contained a "Westport Cargo Blending Clause" which provided that

> Provided safe in the opinion of the master and always provided within the technical capabilities of the Vessel, Charterer to have the option to blend and/or circulate cargo on board .... Such operation shall be carried out entirely at Charterer's risk and in no event shall Owner be responsible for the quality of cargo resulting from such admixture.

Defendants' Trial Memorandum dated July 16, 1999 ("Def.Memo") at 6.

2. All tests at the time of loading were performed on behalf of plaintiff by Inchape Testing Services/Caleb Brett of Los Angeles ("Caleb Brett L.A."). *See id.* at ¶ 5(26). As part of their duties, Caleb Brett L.A. attended and surveyed all loading operations, drew and analyzed samples of cargo from both shore and vessel tanks and reported the results of these analyses. *See id.*

*See id.* at ¶¶ 5(32, 38). Measurements by Caleb Brett L.A. after loading of each parcel indicated that no free water was present in the vessel's tanks upon loading. *See id.* at ¶¶ 5(36), 5(40). Prior to loading any further cargo, the contents of tank 4C were distributed among the ten tanks which already contained the oil from SCE. *See id.* at ¶ 5(43). Measurements and tests taken after the internal transfer indicated that 332 barrels of liquid cargo remained in tank 4C and that no free water was present in any of the tanks. *See id.* at ¶¶ 5(43–44).

Third, the Oshima Spirit received further cargo by ship-to-ship transfer of five parcels of oil from the barge JOVALON ("the Jovalon") at Wilmington, California. *See id.* at ¶ 5(47). The Jovalon had obtained these parcels from shore tanks in Wilmington where Caleb Brett L.A. had performed tests for S & W content. *See id.* at ¶¶ 5(51,54). The first of these parcels contained 1,217 tons of cutter stock with an S & W of 0.05 percent; the second parcel contained 1,112 tons of fuel oil with an S & W of 0.10 percent; and the third, fourth and fifth parcels contained a total of 2,830 tons of cutter stock with respective S & W ratios of 2.4 percent, 3.2 percent and 4.0 percent. *See id.* at ¶¶ 5(47–55). After loading on the Jovalon, the parcels were transferred into ten tanks aboard the Oshima Spirit, but not tank 4C, and Caleb Brett L.A. found no evidence of free water aboard the vessel after such loading. *See id.* at ¶¶ 5(50, 53, 56, 60, 62).

Finally, three parcels totaling 284,750.97 barrels of Peruvian fuel oil were loaded from the motor Vessel ARCADIA ("Arcadia") at the Long Beach Anchorage. *See id.* at ¶ 5(63). Analysis by Caleb Brett L.A. of a composite sample drawn from Arcadia's cargo tanks before discharge to the Oshima Spirit revealed an S & W ratio of 0.10 percent with no free water. *See id.* at ¶¶ 5(67–68). The Arcadia's parcels were loaded into all eleven tanks aboard the Oshima Spirit, including tank 4C, and measurements following the loading indicated that no free water was present in such tanks. *See id.* at ¶¶ 5(69–70).

At this point, the Oshima Spirit's tanks contained five different cargo components, i.e., Low Sulfur Waxy Residual oil ("LSWR") from Singapore, Peruvian fuel oil, light cycle oil, residual fuel oil, and cutter stock, all of which had not yet been fully blended with one another. *See* Def. Memo. at 16. In particular, Vessel Tank 4C contained only Peruvian fuel oil from the ARCADIA and did not contain any of the Texaco, SCE or Jovalon cargoes. *See* JPTO at ¶ 5(75). Using the S & W results from each tank, however, Caleb Brett L.A. calculated a 0.32 percent S & W mathematical average for the cargo in total. *See* Plaintiff's Trial Exhibit ("Pl.Exh.") Nos. 65, 149. Similarly, Caleb Brett L.A. also used S & W results from each shore tank from which the Oshima Spirit's cargo was loaded to calculate a 0.31 S & W mathematical average for the cargo in total. *See* Pl. Exh. Nos. 143, 149. Ultimately, on March 28, 1995, while the Oshima Spirit was en route to Taiwan, plaintiff gave instructions to the crew to transfer all cargo from tank 4C to all other cargo tanks in order to complete the blending of the cargo. *See* JPTO at ¶ 5(81). This transfer plan was carried out at or immediately prior to the vessel's arrival at Kaohsiung. *See id.* at ¶ 5(82).

On March 14, 1995, the Oshima Spirit departed Los Angeles bound for Kaohsiung, Taiwan, with a clean bill of lading endorsed by its master. *See id.* at ¶¶ 5(71–72). En route and beginning on March 30, 1995, defendants made attempts to heat and maintain the cargo at an average temperature of 133.4 degrees Fahrenheit pursuant to the instructions of plaintiff and as required by the charter party. *See id.* at ¶¶ 5(14, 76, 80). In order to heat the cargo to this temperature, the Oshima Spirit used steam heating coils located in each individual cargo tank. *See id.* at ¶ 5(77). The source of the steam for the cargo tank heating coils is an auxiliary

boiler which was located in the vessel's engine room. *See id.* at ¶¶ 5(78, 79).

Prior to the voyage, some of the cargo steam heating coils were not in use due to leaks. *See* Def. Memo. at 24, ¶ 6. Defendant contends that such coils were "blanked off" prior to loading the cargo at issue by isolating such coils and placing blanks in the coil flanges on deck. *See id.* It argues further that the remaining coils were free of leaks and were capable of heating the cargo to a sufficient degree to ensure that no cargo would be remaining on board ("ROB") at discharge. *See id.* at 27. Plaintiff argues to the contrary that such coils were not properly blanked off, and that were they properly isolated there would be insufficient heat to ensure no ROB. *See* Plaintiff's Post–Trial Memorandum of Law dated July 16, 1999 ("Plaintiff's Memo.") at 19. Ultimately, sufficient heat was generated to discharge all of the cargo with no ROB. *See id.*

The vessel's engine log books indicated that the Oshima Spirit consumed approximately twelve tons more water per cargo heating day on the instant voyage than on the prior voyage. *See* Plaintiff's Memo. at 20; Pl. Exh. 133–134. Plaintiff contends that such logs conclusively demonstrate that water was leaking into cargo from the ship's heating coils. Defendants counter that such water consumption was due to the vessel's boiler tubes which had cracks that were discovered shortly after the subject voyage, and at that time the boiler was secured and the tubes repaired. *See* Trial Transcript for dates June 1, 2, 3, 7 ("TT.") at 434–439. Moreover, defendants argue that any leakage in the heating coils would have been noticed in daily checks by vessel engineers, as such leakage would allow oil into the heating coil's steam drainage line. *See* TT. at 407, 432.

The Oshima Spirit arrived at Kaohsiung on April 4, 1995, but given its large size was required to deliver its cargo to port by means of ship-to-ship lighterage to two smaller ships, the MV ST. NIKOLAI ("the St. Nikolai") and the MV HSING YUN ("the Hsing Yun"). *See* Def. Memo. at 14, ¶ 2. By April 6, 1995, the St. Nikolai was prepared to discharge its newly-loaded cargo, and at 1700 hours it tendered its Notice of Readiness ("NOR") to discharge at the Port of Keelung. *See id.* at 14, ¶ 5. However, the St. Nikolai did not receive permission from CPC to discharge until April 14, 1995, two days past its scheduled latest date for arrival on April 12, 1995. *See id.;* JPTO at ¶ 7(113). In the interim, the Hsing Yun, a ship owned by CPC, completed its lighterage operations on April 8, 1995, tendered its discharge NOR on April 9, 1995, and arrived at Port for discharge that same day. *See* JPTO at, ¶¶ 7(114–115); Def. Memo. at 15.

Plaintiff contends that the St. Nikolai's demurrage was incurred because CPC offshore test results indicated that the oil aboard this lighterage vessel exceeded the contractual S & W maximum of 0.5 percent and CPC accordingly needed time to determine where such contaminated oil should be stored. *See* JPTO at ¶¶ 6(5–6). Defendant counters that such delay was inevitable as the berth for the St. Nikolai was being occupied by the Hsing Yun, a ship that CPC owned and gave favoritism to in berthing. *See* Def. Memo. at 14–15.

Upon arrival off Kaohsiung, the Oshima Spirit and the two lighterage vessels were met by surveyors for Inchcape Testing Services/Caleb Brett Taiwan ("ITS Taiwan") and Saybolt Taiwan ("Saybolt") for testing of the cargo.[3] *See* JPTO at ¶¶ 5(89,92). Measurements by ITS Taiwan showed that there was no free water in the Oshima Spirit's tanks before or after lighterage to the St. Nikolai. *See id.* at ¶¶ 5(95, 98). Saybolt's laboratory analysis showed that the S & W content of the cargo aboard the Oshima Spirit prior to discharge was 0.9 percent, and that after lighterage the St. Nikolai's S & W content

---

**3.** ITS Taiwan was retained by plaintiff and Vitol for such analysis. *See id.* at ¶¶ 5(91).

Saybolt was retained by Vitol and CPC. *See id.* at ¶ 5(92).

was 0.6 percent and the Hsing Yun's S & W content was 0.9 percent, with all of such figures above the 0.5 percent contract specification. *See id.* at ¶¶ 5(100–101), 6(2, 9). Saybolt's cargo samples, however, were not available for retesting at the time of this litigation. *See* JPTO at ¶ 7(95).

Analysis was also performed by CPC of cargo samples from the St. Nikolai and Hsing Yun, which revealed S & W contents of 0.8 percent and 0.85 percent, respectively. *See id.* at ¶¶ 6(3,10). However, no samples analyzed by CPC were available for retesting, and CPC denied laboratory access to Caleb Brett L.A.'s manager to witness CPC's tests or testing methodolgy. *See* TT. at 229, 346–347. Moreover, testimony before the Court demonstrated that CPC did not test the S & W content of the subject cargo as ultimately received by CPC in its shore tanks, and that such cargo was in fact placed in shore tanks that already contained cargo from other sources. *See id.* at 252; JPTO ¶ 7(109).

In order to confirm that the cargo was off-specification for S & W, plaintiff arranged for samples from all three ships to be sent to Caleb Brett L.A. for re-analysis. Such analysis revealed that the S & W contents for the Oshima Spirit, St. Nikolai, and Hsing Yun vessels were 0.6 percent, 0.5 percent and 0.6 percent, respectively. *See id.* at ¶¶ 5(102–107). Unlike the samples used by CPC and Saybolt, the samples for such tests were preserved and available to all parties during the course of this litigation. *See* Def. Memo. at 22.

On or about April 18, 1995, CPC Supply Division issued a Notice of Claim to Vitol for alleged cargo damages for S & W content in excess of the maximum specification. *See id.* at ¶ 5(110). Accordingly, CPC assessed Vitol a quality penalty of $28,300, reconditioning costs of $187,200, additional pipeline costs of $51,500 and demurrage penalties of $107,953.02. *See* Def. Memo. at 2. CPC, however, while providing limited answers to foreign letters rogatory, did not provide the parties to this litigation or the Court with terminal documents supporting such reconditioning or extra shore tank expenses. *See* Notice of Taking Depositions by Letters Interrogatory of CPC, Defendants Cross–Examination ("Rogatory Answers") Nos. 6, 7, 13. Ultimately, this action arose when the Vitol charged the sum total of such penalties, $374,953.02, against the purchase price owed to plaintiff pursuant to the Joint Venture. *See* Pl. Exh. 71; TT 42–43.

## DISCUSSION

As the parties have expressly agreed in the Charter Party at issue to incorporate COGSA, their rights and liabilities are governed by this Act. *See Sogem–Afrimet, Inc. v. M/V IKAN SELAYANG*, 951 F.Supp. 429, 437 (1996), *aff'd*, 122 F.3d 1057 (2d Cir.1997), *cert. denied*, 522 U.S. 1112, 118 S.Ct. 1043, 140 L.Ed.2d 108 (1998). COGSA provides in part that a carrier

shall be bound, before, and at the beginning of the voyage, to exercise due diligence to make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation.

46 U.S.C.App. § 1303(c) (2000).

Under COGSA, plaintiff has the burden, which remains with it throughout the case, of proving that "goods were damaged while in the carrier's custody." *Pan–American Hide Co. v. Nippon Yusen (Kabushiki), Kaisha*, 13 F.2d 871, 871 (S.D.N.Y.1921) (L.Hand, J.). A clean bill of lading is ordinarily *prima facie* evidence of delivery in good condition. *See Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 352 (2d. Cir.1981). However, "courts have long recognized that [a clean bill of lading] does not have this probative force where ... the shipper seeks to recover for damage to goods shipped in packages that would have prevented the carrier from observing the damaged condition had it existed when the goods were loaded." *Id.*

(citing *Niel Maersk*, 91 F.2d 932 (2d Cir. 1937) (A.Hand, J.), *cert. denied*, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937)).

█ If plaintiff carries its burden, it is entitled to prevail unless the carrier brings itself within one of the exceptions set forth in section 1304 of COGSA. Most relevant here, a carrier may prove that the cargo suffered from an "inherent vice," which made it impossible for the carrier to deliver undamaged goods. *See* 46 U.S.C.App. § 1304(2)(m). The inherent vice defense requires a carrier to prove that damage resulted from an "existing defect, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time." *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 104 (2d Cir.1977) (citations omitted).

*The S & W Content of the Oil Cargo at Departure*

To establish its burden of delivery of the cargo in good order and condition, plaintiff points to the on-specification results of S & W tests performed by Caleb Brett L.A. at the outset of the Oshima Spirit's voyage. Specifically, as noted above, by performing volumetric calculations of the S & W content in both the shore tanks from which the oil cargo was taken and the ship's tanks into which the cargo was loaded, Caleb Brett L.A. found that the cargo in total had an S & W ratio of 0.31 percent or 0.32 percent, respectively. *See* TT. at 317–320. According to plaintiffs, such tests when compared to with the test results at the conclusion of the voyage of greater than 0.5 percent S & W demonstrate that the cargo was damaged by leaking water during the course of the voyage, presumably by leaking heating coils.

After hearing ample expert and fact evidence at trial with respect to this matter, however, this Court finds that the Caleb Brett L.A. test results are an unreliable indicator of the S & W content of the vessel's oil cargo. Such unreliability initially becomes evident in examining the methodology of the tests themselves. The parties agree, and Caleb Brett L.A. confirmed, that these particular tests, unlike the substantial majority of other tests at issue in this litigation, represent only mathematical estimates of the S & W percentage of the cargo in total. *See* TT. at 298–300, 319–320. In performing such tests, Caleb Brett L.A. individually tested each individual shore or vessel tank where only a part of the cargo was located prior to a complete blending of the cargo within such tanks. *See* Pl. Exh. 65, 143, 149. As such, Caleb Brett L.A.'s analysis necessarily only represents a hypothetically blended cargo from which S & W content was extrapolated by using complex volumetric calculations. *See* TT. at 298–300. Accordingly, the theoretical nature of these tests requires that the Court give them less weight than those tests performed on fully blended samples, particularly in light of testimony that the reliability of theoretical testing is largely dependent on the representativeness of samples used. *See* TT. at 298–300, 353–356.

Moreover, as noted by several witnesses testifying before this Court whom the Court finds credible, this theoretical method of calculating S & W content was particularly unreliable here because two of the oil components loaded onto the Oshima Spirit contained materials which were likely to have masked the water content of the full cargo. *See* TT. at 595–597; 633. Specifically, the LSWR component of the oil, loaded onto the Oshima Spirit from the Texaco terminal in Los Angeles, contains wax which is likely to promote the emulsification of water within the oil and thereby mask water content during testing. *See* JPTO at ¶ 7(49); TT. at 595–597, 646. Moreover, a second component, cutter stock loaded from the barge Jovalon, was likely to have contained a type of reclaimed waste lube oil from automobiles and trucks which has inherent sediment content including dirt, iron fillings, rust and burnt iron fillings. *See* TT. at 590–597. Cutter stock can therefore both enhance sediment content and, like the wax

in the LSWR component, mask the true water and sediment content of the oil. *See* TT. at 392–392, 590–597, 633, 646–647. Undoubtedly, the presence of such materials coupled with the theoretical nature of these tests enhanced the difficulties faced by Caleb Brett L.A. in accurately testing for S & W content. For these reasons, the Court finds that the tests performed by Caleb Brett L.A at the outset of the Oshima Spirit's voyage are unreliable indicators of the S & W content of cargo placed aboard this vessel.

*The Oshima Spirit Heating Coils*

The Court also finds that significant leakage from the heating coils of the Oshima Spirit was unlikely, further demonstrating that Caleb Brett L.A.'s tests of low S & W content at the ship's departure were unreliable. Unrefuted testimony before this Court demonstrates conclusively that the vessel's heating coils had leaked on a prior voyage and that, as a result, vessel personnel took necessary precautions to ensure leakage would not occur on the instant voyage. Specifically, prior to loading any cargo, vessel personnel checked the cargo tank's heating coils with pressurized air to test their integrity. *See* TT. at 460. At this time, leaking coils were identified and the steam coil supply and drain valves to such leaking coils were secured by wires in a closed position. *See* TT. at 432–434, 460; Defendants' Exhibit ("Def.Exh.") A7, Photographs taken by Captain Uwe Schwartz of Cargo Heating System on "Semaku Spirit" ("Def.Photos"), No. 10. Thereafter, upon the vessel's departure from Los Angeles and prior to commencement of heating the cargo, the Chief Mate and vessel engineers checked the ship's coils again and isolated those coils that leaked by placing blanks/blinds in the coil flanges on deck. *See* TT. at 409–411, 421; Pl. Exh. 136, Deposition of Rawinder Pal Singh Rai at 8, 14–17, 19.

Similarly, credible testimony demonstrates that ship personnel regularly checked the heating coils supply and drainage valves of the heating coils for leaks and that no leaks were observed. *See* TT. at 419. As witnesses before this Court described, steam heating coil manifolds consist of both supply and return drain valves. *See* TT. at 407–408; Def. Photos Nos. 7–8, 11–13. Once steam condensate water is returned from the cargo tanks to the boiler via the return drain valve, it is received into a cascade tank that is located in the Vessel's engine room. *See id.* This cascade tank is equipped with lighted sight glasses and hatch covers, which allow engineering personnel aboard the vessel to visually inspect the steam condensate return. *See* TT. at 412–415; Def. Photos, Nos. 14–19. If such coils were compromised in some way, oil from the cargo would enter the coils and be returned to the cascade tank where it would be observed. *See* TT. 407–408, 412–413; Def. Photos Nos. 7–8, 11–13. During the instant voyage, the Oshima Spirit's Auxiliary Boiler Water Reports did not record the presence of any oil in the cascade tank returns, and the Captain of the Oshima Spirit confirmed the accuracy of such reports in testimony before this Court.[4] *See* TT. at 432–434, 445.

This Court's conclusion that leakage from the heating coils was unlikely is further bolstered by indications that no free water was reported in any cargo tank aboard the Oshima Spirit or the lighterage ships either during the voyage or upon the discharge of cargo. *See* TT. at 421, 438; JPTO ¶¶ 5(95, 97–98). Free water is generally measured by using a water-cut paste placed upon a sounding rod, which is in turn inserted to the bottom of cargo tanks. *See* Def. Memo. at 26. When such paste is placed in water (which is heavier than oil and likely to be at the bottom of the tank)

---

4. The Court further finds testimony regarding the diligence of the ship's engineers in checking the cascade returns to be credible because it is apparent that such individuals believed the presence of oil in the boiler could potentially cause the boiler to explode. *See* TT. at 412, 415.

it will change color at the water level. *See* TT. at 199–201. Here, the alleged leaks totaled approximately 1,000 bbl., an ample quantity that this Court finds should have become readily apparent in tests for free water performed upon the discharge of the cargo. *See* TT. at 215, 443. As the parties agree that no such water was found upon discharge, a preponderance of the evidence demonstrates that leakage from the ship's heating coils did not occur.[5]

Finally, no leakage was likely as the Oshima Spirit's heating coils were capable of heating the oil cargo to the degree necessary for a full discharge with no ROB. The Oshima Spirit is a single-skinned tanker, with its heating coils located at the bottom of its cargo tanks.[6] *See* Transcript of Oral Argument dated September 9, 1999 ("OA Transcript") at 698. Such coils are necessary to heat the cargo, particularly at the bottom of the hull which is adjacent to cold seawater, if it is to liquify to the extent necessary to be removed from the hull upon discharge. *See* TT. at 430–432. Here, no ROB was present upon discharge, demonstrating that coils were free of leaks and capable of fully warming the cargo. *See* Pl. Exh. 57; TT. at 429–432. While plaintiff argues that the heating coils, even if leaking, were capable of discharging the ship's cargo with no ROB, it agrees with defendant that on the prior voyage of the ship, cargo was actually left as ROB when such coils were leaking. *See* Plaintiff's Memo. at 18–19. The continued presence of such leaks on the instant voyage would have thus made it highly unlikely that the cargo could have been, as it was here, fully discharged at the conclusion of the voyage.[7] *See id.*

### The S & W Content of the Oil Cargo Upon Discharge

In determining the S & W content of the oil cargo upon discharge in Taiwan, this Court must assess the relative merit of three distinct tests that each purport to present correct measurements of such content. As noted above, Saybolt, which was hired by both Vitol and CPC, performed sample analyses that demonstrated the S & W content of the cargo aboard the Oshima Spirit prior to discharge was 0.9 percent, and that the S & W contents of the St. Nikolai and Hsing Yun cargo upon lighterage were 0.6 percent and 0.9 percent, respectively. *See* JPTO at ¶¶ 5(100–101), 6(2, 9). Such samples, however, used by Saybolt were unavailable for retesting as they were apparently destroyed in Saybolt's normal course of business, ninety days after testing.[8] *See* JPTO at ¶ 7(95).

Similarly, analysis by CPC of cargo samples from the St. Nikolai and Hsing Yun revealed S & W contents of 0.8 percent and 0.85 percent, respectively. *See id.* at

5. This is especially true because leakage from the heating coils would occur at the bottom of the tanks and would be likely to remain as free water. *See id.*

6. A single-skinned tanker, as distinct from a double-hull tanker, has no insulation between the cargo tank and the water within which the ship travels. *See* TT. at 431. Accordingly, the temperature of the cargo is likely to be affected to a greater degree by the temperature of such water. *See id.*

7. The Court similarly rejects both plaintiff's arguments that leaking was likely because the heating coils aboard the vessel were old and because the vessel's engine log books indicated that the ship consumed approximately twelve tons more water per cargo heating day on the instant voyage than on the prior voy-

age. *See* Plaintiff's Memo. at 20; Pl. Exh. 133–134. In this respect, the Court credits testimony from the ship's captain noting that such water was likely consumed due to an unrelated problem of cracks in the vessel's boiler tubes which were discovered in May of 1995 after the subject voyage. *See* TT. at 434–439. Such explanation appears more reasonable given the Court's findings that the crew properly isolated leaking coils, that no oil was found in steam returns in the cascade tank, and that no free water or ROB was found in the cargo tanks upon the cargo's discharge.

8. Westport requested that such samples be preserved, but this request was apparently made after the conclusion of the ninety day period within which the samples were destroyed. *See* TT. at 249–250.

¶¶ 6(3,10). However, as is case with Saybolt, no samples analyzed by CPC were available for retesting as such samples were apparently used in their entirety during initial testing. *See* TT. at 229. Moreover, while inspectors from Saybolt without experience in chemistry apparently witnessed the tests performed by CPC on such samples, CPC denied laboratory access to Caleb Brett L.A.'s manager to witness such tests. *See* TT. at 346–347.

Finally, at plaintiff's insistence, samples from all three ships were sent to Caleb Brett L.A. for re-analysis which revealed that the S & W content for the Oshima Spirit, St. Nikolai, and Hsing Yun was 0.6 percent, 0.5 percent and 0.6 percent, respectively. *See id.* at ¶¶ 5(102–107). Unlike the samples used by Saybolt and CPC, such samples remain in existence and were available for inspection and re-analysis by all parties to this litigation. *See* Def. Memo. at 22.

In assessing the relative merit of these test results, the Court concludes that the only truly effective tests performed on the cargo, which were properly subject to examination at the time of trial, were those performed at plaintiff's insistence by Caleb Brett L.A. Those tests obtained results that are close to specification and, in fact, appear to be within the margin of error for an on-specification result. Obviously, the St. Nikolai test result of 0.5 percent S & W meets the CPC contract specification of 0.5 percent. Furthermore, as testified to by both the laboratory manager of Caleb Brett L.A. and defendant's expert Dr. Carl Gryte, Vice Chairman and Professor of Chemical Engineering at Columbia University, both of whom the Court finds credible, the 0.6 percent S & W readings from the Oshima Spirit and Hsing Yun are within the American Society for Testing and Materials ("ASTM") test method reproducibility margin of 0.15 percent, mak-

ing such results functionally equivalent to the 0.5 percent specification. *See* TT. at 369, 372–373, 378, 640, 643–646.

Neither the integrity of the Caleb Brett L.A. test results nor its testing process have been challenged by plaintiffs, other than to note that the disparity between such tests and those of Saybolt and CPC are statistically significant. On the other hand, however, defendants have with some force attacked the tests performed by Saybolt, arguing that Saybolt's S & W results are fundamentally inconsistent with Saybolt's findings for the distilled water and sediment extraction components of the same oil cargo. Specifically, defendants argue that while Saybolt finds an S & W content of 0.9 percent, the constituent parts of the S & W analysis, distilled water and sediment extraction, yield figures of 0.1 percent and less than 0.1 percent respectively, which when combined reach nowhere near 0.9 percent in total.[9] *See* OA Transcript at 692–693; TT. at 663–665.

This Court agrees with defendants that it is highly improbable that the amount of sediment in the instant cargo would be nine times that of the water leakage, particularly where plaintiff attributes the excess S & W in the cargo solely to leakage of water from the ship's steam coils. *See* TT. at 664–667. Similarly, even assuming sediment could comprise such a significant percentage of the S & W content of the cargo, Saybolt's S & W ratio of 0.9 percent remains suspect given that the sediment extraction component alone yields a percentage of less than 0.1 percent. *See* TT. at 666. This Court therefore concludes that Caleb Brett L.A.'s analysis presents a more compelling assessment of the S & W content of the Oshima Spirit's cargo than that of Saybolt, and that the cargo at issue was delivered within a margin of error for on-specification delivery. Such conclusion is particularly warranted in the circum-

---

9. Several witnesses before this Court in fact testified that the water by distillation test is a much more accurate indicator of water content within a cargo than the S & W test, further demonstrating that Saybolt's finding of 0.9 percent S & W was inordinately high. *See* TT. at 302, 664.

stances presented here, where defendants' attack on Saybolt's results are unrefuted, and where samples utilized by Saybolt are no longer available for inspection whereas those used by Caleb Brett L.A. have been and are available for inspection by all parties.

The Court similarly discounts findings by CPC, as samples used for testing are unavailable, and CPC, an interested party, failed to provide adequate documentation of its tests or allow observation of tests by independent surveyors from Caleb Brett L.A. *See* TT. at 346–347; Rogatory Answers Nos. 6, 7, 13. Moreover, CPC's S & W assessments are inherently suspect given CPC's willingness to combine the allegedly defective cargo at issue here with presumably non-defective oil already within its shore tanks. *See* TT. at 252. Indeed, this circumstance supports the inference that CPC believed that the cargo was on-specification for S & W. Thus, for all of the foregoing reasons, the Court finds plaintiff has failed to establish defendant's liability by a preponderance of the evidence and its claims must therefore be dismissed.[10]

*Damages*

■ In any event, even if plaintiff had established liability, its claims must be dismissed because it has failed to prove damages. Under section 1304(5) of COGSA, "[i]n no event shall [a] carrier be liable for more than the amount of damage actually sustained." Generally, this standard translates into a measure of damages computed as "the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value of the goods in the condition in which they actually did arrive." *Texport Oil Co. v. M/V AMOLYNTOS*, 11 F.3d 361, 365 (2d Cir.1993). However, consequential damages are appropriate, insofar as such damages "may fairly and reasonably be considered either arising

naturally, *i.e.*, according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it." *McKernin & Co. v. United States Lines, Inc.*, 416 F.Supp. 1068 (S.D.N.Y.1976) (quoting *Hadley v. Baxendale*, 9 Exch. 341 (1854)). In the case of consequential damages, damages must also be proved with a reasonable degree of certainty, or "a reasonable degree of persuasiveness in the proof of the fact and of the amount of damage." *Bouchard Transport. Co. v. The Tug "Ocean Prince"*, 691 F.2d 609 (2d Cir.1982) (quoting C. McCormick, *Handbook on the Law of Damages* § 26, at 99 (1935)).

■ Here, this Court finds that even if cargo was in fact delivered off-specification, plaintiff has not provided the Court with sufficient proof that such damages were actually incurred or that they were reasonably foreseeable to defendants. Initially, while plaintiff claims that CPC imposed contractual penalties totaling $374,953.02 for quality penalties, reconditioning costs, transport costs and demurrage, plaintiff has failed to provide any documentation as to how such figures were determined by CPC. In fact, to the contrary, documents provided to this Court indicate that CPC was unwilling to provide any documentation of such damages and that plaintiff made only tepid demands for such documentation in order to preserve harmonious relations with CPC, a national oil company with significant contractual power over plaintiff. *See* Def. Exh. 75, Telex from CPC to Vitol dated November 27, 1996 (noting that CPC would *"exceptionally* provide [Vitol] with [only a ] breakdown of total claim amount . . . and . . . will not provide further calculation details.") (emphasis added); Def. Exh. 12, Transmittal From Vitol–Los Angeles to

**10.** As the Court concludes that plaintiff has failed in meeting its initial burden of proving that cargo was presented to defendant on-specification but was off-specification upon delivery, the Court need not address the merits of defendants' inherent vice defense.

Westport dated 4/21/95 (noting that Vitol's Representative visited CPC to soften penalties and that CPC was "not pleased with the incident ... not interested in discussing any reductions of the previously imposed penalties [and that] we have not received any information concerning possible claim on their vessel Hsing Yun and we are not going to ask them to clarify."); *see also* Rogatory Answers Nos. 6, 7, 13; JPTO at ¶ 5(124).

Plaintiff's failure to present this Court with sufficient documentation related to the penalties imposed by CPC stands in stark contrast to evidence demonstrating that reconditioning and demurrage costs were improperly assessed by CPC. With respect to reconditioning costs, defendants present unrebutted expert testimony that industrial grade fuel oil typically has an S & W content of 1.0 percent, an amount that exceeds even the worst S & W estimates presented by plaintiff. *See* TT. at 601–602. Moreover, this Court finds it particularly noteworthy that CPC did no testing of the cargo upon placement in shore tanks, where the cargo was to be fully blended in total and stored prior to its ultimate use. *See* TT. at 247. Indeed, rather than perform such tests, CPC placed such cargo in shore tanks which already contained cargo from other sources. *See* TT. at 252. In such circumstances, particularly given plaintiff's failure to provide any substantive documentation of reconditioning costs, plaintiff cannot fairly claim that CPC was unable to use the cargo at issue here in the normal course of its business.

Similarly, this Court finds that penalties for demurrage of the St. Nikolai are not properly recoverable by plaintiff because any such demurrage was inevitable due to berth congestion and not due to the delivery of off-specification cargo. The St. Nikolai, following lighterage operations, arrived at the Port of Keelung and issued its NOR for discharge the afternoon of April 6, 2000, six days before any demurrage charges were to be incurred. *See* Def. Memo. at 14. Nonetheless, the ship remained at Port for eight days, the final two days of which were considered as demurrage, until CPC finally allowed this ship to discharge its cargo. *See id.;* JPTO ¶ 7(13).

Significantly, as evidence from the time logs of Saybolt indicates, the berth for the St. Nikolai was occupied by the CPC-owned Hsing Yun during the time of demurrage. *See* Def. Memo. at 14–15. Consistent with such logs, as the parties agree, the Hsing Yun tendered its discharge NOR on April 9, 1995 and immediately thereafter was given permission by CPC to discharge on that same day. *See* JPTO at ¶¶ 7(114–115). Such circumstances, particularly given plaintiff's failure to present any evidence that demurrage was necessary because of an off-specification delivery,[11] amply demonstrate that any delay in discharge was due solely to the preference exhibited by CPC to its own lighterage vessel at the point of discharge. This Court thus finds that such delay was not properly attributable to defendants and that no damages for demurrage may properly lie against them.

Finally, the Court finds that defendants are not properly liable for any damages pursuant to the CPC contract, as such damages were "not in the usual course of things" or in the contemplation of the parties at the time they entered into the Charter Party. *See McKernin,* 416 F.Supp. at 1069. While it is not entirely clear whether defendants were aware of the oil's ultimate usage, defendants cer-

---

11. As discussed *supra,* to the extent that plaintiff claims that such delay was due to delivery of an off-specification cargo, *see* JPTO at ¶¶ 6(5–6), this contention is belied by CPC's ultimate decision to place such cargo in shore tanks that contained other, unspecified cargo. *See* TT. at 253. Absent evidence of the composition of the cargo in the shore tank, this Court is compelled to conclude that CPC found the cargo sufficient for industrial use and that demurrage was due solely to its decision to give priority to the discharge its own vessel.

tainly could not foresee that they would be subject to penalties imposed at the whim of CPC without full documentation or any other viable proof that damages were in fact incurred. Indeed, such forseeability is particularly lacking in circumstances like those here, where a charterer is reluctant to demand full and complete damage assessments from the recipient of its goods due to either a power disparity or the desire to preserve a harmonious ongoing relationship.

## CONCLUSION

For the foregoing reasons, the Court hereby finds that plaintiff has failed to meet its burden under COGSA of demonstrating that it delivered cargo in good condition to defendants for transfer and, in any event, that any damages incurred by plaintiff are not properly recoverable from defendants. This action is therefore dismissed in its entirety with prejudice and without costs to either party. The Clerk of the Court is directed to close the above-captioned action.

It is **SO ORDERED.**